PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 12-3863
_____

PG PUBLISHING COMPANY, d/b/a
The Pittsburgh Post-Gazette,

                                    Appellant

v.

CAROL AICHELE, in her capacity as Secretary
of The Commonwealth; ALLEGHENY COUNTY
BOARD OF ELECTIONS; MARK WOLOSIK,
in his capacity as Division Manager of the
Allegheny County Elections Division

_____

APPEAL FROM THE UNITED STATES DISTRICT
COURT FOR THE WESTERN DISTRICT OF
PENNSYLVANIA
(D.C. Civ. Action No. 2:12-cv-00960)
District Judge: Honorable Nora B. Fischer
_____

Argued October 24, 2012
_____

Before: HARDIMAN, GREENAWAY, JR., and
VANASKIE, *Circuit Judges*.

(Opinion Filed: January 15, 2013)
_____

Frederick N. Frank, Esq. [ARGUED]
Ellis W. Kunka, Esq.
Frank, Gale, Bails, Murcko & Pocrass
707 Grant Street
Gulf Tower, 33rd Floor
Pittsburgh, PA 15219
        *Counsel for Appellant PG Publishing Company*

Kemal A. Mericli, Esq. [ARGUED]
Office of Attorney General of Pennsylvania
564 Forbes Avenue
Manor Complex
Pittsburgh, PA 15219
        *Counsel for Appellee Carol Aichele*

George M. Janocsko, Esq.
Andrew F. Szefi, Esq.
Office of Allegheny County
Law Department
445 Fort Pitt Boulevard
300 Fort Pitt Commons Building
Pittsburgh, PA 15219

Allan J. Opsitnick, Esq.
564 Forbes Avenue
Suite 1301
Pittsburgh, PA 15219
    *Counsel for Appellees Allegheny County Board of*
    *Elections and Mark Wolosik*

Teri L. Henning, Esq.
Pennsylvania Newspaper Association
3899 North Front Street
Harrisburg, PA 17110
    *Counsel for Pennsylvania Newspaper Association,*
    *Amicus Appellant*

_____

OPINION

_____

GREENAWAY, JR., *Circuit Judge*.

The instant case calls upon us to decide whether a state statute restricting access to a polling place infringes on the media's First Amendment right to gather news. Appellant PG Publishing Company ("Appellant" or "PG") seeks review of the District Court's decision to dismiss its suit against election officials for the Commonwealth of Pennsylvania. Specifically, Appellant alleges violations of the First Amendment and the Equal Protection Clause of the Fourteenth Amendment. Appellant also seeks review of the District Court's refusal to enter a consent decree agreed to by

PG and one of the parties relating to the suit. For the reasons set forth below, we will affirm the District Court's decisions.

## I. Background

Appellant brought suit pursuant to 42 U.S.C. § 1983 against (1) Appellee Carol Aichele ("Appellee") in her capacity as the Secretary of State of the Commonwealth of Pennsylvania, (2) the Allegheny County Board of Elections, and (3) Mark Wolosik in his capacity as the Division Manager for the County Elections Division (collectively, "Defendants").[1] Appellant's suit addressed the constitutionality of 25 Pa. Stat. Ann. § 3060(d), a portion of the Pennsylvania Election Code mandating that

> [a]ll persons, except election officers, clerks, machine inspectors, overseers, watchers, persons in the course of voting, persons lawfully giving assistance to voters, and peace and police officers, when permitted by the provisions of this act, must remain at least ten (10) feet distant from the polling place during the progress of the voting.

---

[1] The Board and Mr. Wolosik are not participating in this appeal.

[2] The Amended Complaint purported to allege three causes of action; however, the third count appears to be a request for injunctive relief based on Appellant's claim of an Equal Protection Clause violation.

[3] At oral argument, Appellant claimed that § 3060(d), as applied in Allegheny County, prohibited its reporters from even recording *in the direction* of a polling place. This is not

4

25 Pa. Stat. Ann. § 3060(d). A "polling place" is "the room provided in each election district for voting at a primary or election." 25 Pa. Stat. Ann. § 2602(q).

In its Amended Complaint, Appellant asserted two claims:[2] (1) that § 3060(d) infringed on its First Amendment "right to access and gather news at polling places" ("Count I"), and (2) that Defendants' selective enforcement of § 3060(d) presented a violation of the Equal Protection Clause of the Fourteenth Amendment ("Count II"). (App. at 81a-84a.)

In support of Count I, Appellant alleged that "its reporters and photographers had previously been denied access to polling places to gather news" in Allegheny and Beaver Counties. (*Id.* at 76a.) Appellant also alleged that, in October 2008, Mr. Wolosik and the Allegheny County Board of Elections notified Appellant that not only was "any type of recording inside the polling place . . . prohibited under [the County's] policy," but that "the Pennsylvania Election Code limited [Appellant's] reporters and photographers from being inside polling places" altogether.[3] (*Id.* at 76a.) Appellant

---

[2] The Amended Complaint purported to allege three causes of action; however, the third count appears to be a request for injunctive relief based on Appellant's claim of an Equal Protection Clause violation.

[3] At oral argument, Appellant claimed that § 3060(d), as applied in Allegheny County, prohibited its reporters from even recording *in the direction* of a polling place. This is not so. In November 2008, in a separate state proceeding, Appellant successfully petitioned the state court for an order, directing that

5

further contended that reporting from within polling places during the November 6, 2012 election was particularly important because "for the first time, the Voter ID Law, House Bill No. 934, Session of 2011[4] [was to be] enforced, which [would have required] all electors to present a government-approved photo ID in order to be allowed to vote in any election in the Commonwealth."[5]   (*Id.* at 79a-80a.)

> [Mr. Wolosik and the Allegheny County Board of Elections] and their agents are hereby prohibited from restricting or interfering with attempts of Plaintiff's agents and employees to photograph activities in or around polling places so long as Plaintiff's agents and employees are located in areas accessible to the public or into which they have otherwise been lawfully admitted.  No photography shall be taken from inside the polling place or within ten (10) feet of the entrance of the polling place.

(App. at 76a.)   At issue in the state court was Allegheny County's policy of prohibiting filming from within areas accessible to the public and beyond the 10-foot boundary imposed by § 3060(d).  Despite the language in the order, the state court did not have occasion to rule on the constitutionality of § 3060(d) itself.

[4] Nothing in our decision today relates to the Voter ID Law.  We mention it *only* because Appellant has alluded to its purported relevance in the Amended Complaint and briefs.

[5] After Appellant filed its Amended Complaint, the Pennsylvania courts suspended the operative provision in the law.  *See Applewhite v. Commonwealth*, No. 330 M.D. 2012,

Appellant sought (1) a declaratory judgment holding § 3060(d) to be unconstitutional as applied and (2) compensatory damages for past infringement of its First Amendment rights.[6]

To establish its equal protection claim in Count II, Appellant alleged that its reporters had been "denied access to photograph in polling places in Allegheny and Beaver Counties." (*Id.* at 77a.) At the same time, Appellant set out a number of examples where reporters from other Pennsylvania newspapers had the opportunity to take photographs inside polling places in counties other than Allegheny or Beaver Counties. Finally, Appellant alleged that its own reporters previously had been allowed inside polling places in Allegheny County "for the purpose of reporting upon and photographing the electoral process only as it relates [to certain] public figures." (*Id.* at 79a.) Appellant then requested (1) a declaratory judgment that the counties' application of § 3060(d) violates the Equal Protection Clause

---

2012 WL 4497211 (Pa. Commw. Ct. Oct. 2, 2012). At oral argument, both counsel for Appellant and Appellee conceded that this past election represented a "soft test" of the law, in that identification may have been requested, but was not required.

[6] In setting out Count I, Appellant alleged that § 3060 "impermissibly restrict[ed its] First Amendment right to gather news and, thus, [was] facially unconstitutional." (App. at 82a.) Read in the context of Appellant's other allegations, we do not take this language as asserting a facial challenge to § 3060. Appellant conceded as much during oral argument.

7

and (2) injunctive relief (either preliminary or permanent) against further discrimination.

Pursuant to Federal Rule of Civil Procedure 12(b)(6), Defendants moved to dismiss the suit and the District Court granted the motion. As to Count I, the District Court noted that § 3060(d) applies to an individual's physical location and not his speech, therefore obviating the need to determine whether a polling place was a public forum. *PG Publ'g Co. v. Aichele*, No. 12-CV-960, 2012 WL 4796017, at *22 (W.D. Pa. Oct. 9, 2012). The District Court then analyzed the statute under the rubric of content-neutral laws applied in nonpublic fora and held that PG's First Amendment rights were not abridged given that § 3060(d) is a "[content]-neutral law of general application seeking to protect an individual's 'right to cast a ballot in an election free from the taint of intimidation and fraud.'" *Id.* at *27 (quoting *Burson v. Freeman*, 504 U.S. 191, 211 (1992)).

As to the equal protection claim in Count II, the District Court held that the examples of inconsistent enforcement of § 3060(d) alleged in Appellant's Amended Complaint did not rise to the level of a constitutional violation. Specifically, the District Court held that Appellant failed to establish that "a single election official ha[d] *discriminated* against reporters working for" Appellant in applying § 3060(d). *Id.* at *29 (emphasis in original).

Additionally, in September 2012 — roughly a month after Defendants filed their motion to dismiss — Appellant and the Allegheny County Board of Elections moved jointly for entry of a consent decree which they argued, in essence, resolved the dispute ("Consent Order"). The Consent Order permitted Appellant and its reporters to enter polling places in

8

Allegheny County for purposes of recording the sign-in process. This permission was subject to various restrictions including, for example, an obligation for Appellant's personnel to stop recording if voters objected. The Consent Order was also explicitly "conditioned upon [Appellant] discontinuing its action against the Commonwealth." (App. at 142a.) Appellee, not a party to the Consent Order, objected that the Order was illegal in that it essentially permitted Appellant to act in contravention of a valid state law (§ 3060(d)). The District Court agreed and refused to enter the Order, noting that the parties could not "use a consent decree to enforce 'terms which would exceed their authority and supplant state law.'" *Id.* at \*32 (quoting *Keith v. Volpe*, 118 F.3d 1386, 1393 (9th Cir. 1997)).

PG filed a timely appeal from the District Court's aforementioned rulings. Given that Election Day was fast approaching, we granted the parties' motion to expedite the proceedings. On November 1, 2012, we entered an order affirming the District Court's rulings. This opinion sets forth the bases of the Order.

## II.    Standard of Review

We exercise plenary review over the District Court's grant of a motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6). *Santiago v. Warminster Twp.*, 629 F.3d 121, 128 (3d Cir. 2010). "[I]n deciding a motion to dismiss, all well-pleaded allegations of the complaint must be taken as true and interpreted in the light most favorable to the [Appellant], and all inferences must be drawn in [its favor]." *McTernan v. City of York*, 577 F.3d 521, 526 (3d Cir. 2009) (citation omitted). To withstand a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter,

9

accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks omitted).

We review the District Court's ruling regarding the Consent Order for an abuse of discretion, *see NutraSweet Co. v. Vit-Mar Enters.*, 176 F.3d 151, 153 (3d Cir. 1999), and look to see whether the decision was "arbitrary, fanciful or clearly unreasonable." *Democratic Nat'l Comm. v. Republican Nat'l Comm.*, 673 F.3d 192, 201 (3d Cir. 2012) (quoting *Moyer v. United Dominion Indus., Inc.*, 473 F.3d 532, 542 (3d Cir. 2007)); *see also Hanover Potato Prods., Inc. v. Shalala*, 989 F.2d 123, 127 (3d Cir. 1993) ("An abuse of discretion arises when the district court's decision rests upon a clearly erroneous finding of fact, an errant conclusion of law or an improper application of law to fact." (internal quotation marks omitted)).

## III.    The Right of Access

Appellant argues that it has a constitutionally protected right of access to gather news at the polling place and that any restriction on this right must be reviewed under strict scrutiny.  While PG never explicitly claims that the media should have greater First Amendment rights than the general public, Appellant's arguments hinge on one particular principle: that the Framers "thoughtfully and deliberately selected [the press] to improve our society and keep it free." (Appellant's Br. 15 (quoting *Mills v. Alabama*, 384 U.S. 214, 219 (1966)).[7]

---

[7] The brief filed by the Pennsylvania Newspapers Association as amicus curiae advances a similar point.  In

10

Appellee counters that (1) Appellant enjoys no greater right to gather news than what has been granted to the general public, (2) that § 3060(d) is a law of general applicability which *incidentally* burdens Appellant's right to gather news, and (3) that a polling place is a nonpublic forum thereby implicating only a modest constitutional review — one that § 3060(d) passes.

In reviewing the constitutional validity of a statute, "[t]he first issue to be addressed . . . is whether a First Amendment right exists, for 'if it [does] not, we need go no further.'" *Kreimer v. Bureau of Police for Town of Morristown*, 958 F.2d 1242, 1250-51 (3d Cir. 1992) (second alteration in original) (quoting *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 797 (1985)). We therefore consider whether a First Amendment right to gather news exists, and if it does, whether Appellant enjoys its protections.

## A. The Right of Access is Limited

It is beyond peradventure that "[t]he constitutional guarantee of a free press 'assures the maintenance of our political system and an open society,' and secures 'the paramount public interest in a free flow of information to the

---

describing its interest as an amicus, the Association notes that it "wishes to participate in this matter [in part] to stress the policy considerations that mandate an interpretation of the Pennsylvania Election Code and the First Amendment to safeguard the right of the news media to observe and report on the election process in the Commonwealth of Pennsylvania." (Amicus Br. 1.)

people concerning public officials.'" *Pell v. Procunier*, 417 U.S. 817, 832 (1974) (citation omitted); *see also Pennekamp v. Florida*, 328 U.S. 331, 354-55 (1946) (Frankfurter, J., concurring) ("Without a free press there can be no free society. Freedom of the press, however, is not an end in itself but a means to the end of a free society." (footnote omitted)). For this reason, the Supreme Court has recognized that the First Amendment — in addition to protecting freedom of speech and the press — must also contain protections for some news-gathering activity. *See, e.g.*, *Branzburg v. Hayes*, 408 U.S. 665, 681 (1972) ("[W]ithout some protection for seeking out the news, freedom of the press could be eviscerated.").

Yet, the Supreme Court has held, time and again, that this First Amendment right of access to information is qualified and subject to limitations. In *Zemel v. Rusk*, the Supreme Court held that "[t]he right to speak and publish does not carry with it the unrestrained right to gather information." 381 U.S. 1, 17 (1965). Going further, the Court cautioned that:

> [t]here are few restrictions on action which could not be clothed by ingenious argument in the garb of decreased data flow. For example, the prohibition of unauthorized entry into the White House diminishes the citizen's opportunities to gather information he might find relevant to his opinion of the way the country is being run, but that does not make entry into the White House a First Amendment right.

12

*Id.* at 16-17; *see also Branzburg*, 408 U.S. at 684 ("It has generally been held that the First Amendment does not guarantee the press a constitutional right of special access to information not available to the public generally."); *Pell*, 417 U.S. at 834 ("The First and Fourteenth Amendments bar government from interfering in any way with a free press. The Constitution does not, however, require government to accord the press special access to information not shared by members of the public generally.").

Appellants are therefore correct in arguing that the First Amendment encompasses a right of access for news-gathering purposes. However, we decline to hold — as Appellant and the amicus curiae hope — that the press is entitled to any greater protection under this right than is the general public. The Supreme Court's pronouncement on this issue is unequivocal: "[T]he First Amendment does not guarantee the press a constitutional right of special access to information not available to the public generally." *Branzburg*, 408 U.S. at 684. Thus, while the First Amendment does protect Appellant's right of access to gather news, that right does not extend to *all* information.

### B. The Right of Access is Distinct from the Right to Free Speech

Before proceeding further, we note that the word "access" may cause some consternation.[8] Much of First

---

[8] The plurality opinion in *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555 (1980), recognized this potential issue and noted that the name of the right was immaterial — the distinction lay in what the right protected:

Amendment jurisprudence is couched in the language of access. For example, when addressing traditional issues of free speech on government property, courts apply the well-established forum analysis (where the essential formulation is whether the government may restrict "access" to a particular forum). *See Perry Educ. Ass'n v. Perry Local Educators' Ass'n*, 460 U.S. 37, 44-46 (1982) (discussing the constitutional difference between restriction on access to public and nonpublic fora in the language of a "right of access to public property").

Importantly, we do not address here limitations on access to a forum for speech purposes; indeed, we are not concerned here with expressive conduct or speech at all. (Appellant conceded as much at the beginning of oral argument.) Rather, our focus is on access to information.[9]

> It is not crucial whether we describe this right to attend criminal trials to hear, see, and communicate observations concerning them as a 'right of access' or a 'right to gather information,' for we have recognized that 'without some protection for seeking out the news, freedom of the press could be eviscerated.'

*Id.* at 576 (footnote omitted) (citations omitted) (quoting, among others, *Branzburg*, 408 U.S. at 681).

[9] Likewise, we do not address here the right to listen — a concept analogous to, but still distinct from the right at issue in this case. *See Va. State Bd. of Pharm. v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 757 (1976); *see also Lamont v. Postmaster Gen.*, 381 U.S. 301, 308 (1965)

14

Thus, we do not believe that the traditional forum analysis is apposite here. If we were to apply such a framework, the government would be free to shut down nonpublic fora completely, thereby hiding any activities behind a veil of secrecy.[10] It cannot be that the First Amendment would

(Brennan, J., concurring) ("It would be a barren marketplace of ideas that had only sellers and not buyers."). The right to listen is derivative of an individual's right to speak, for the Supreme Court has held that "where a [willing] speaker exists . . . the protection afforded is to the communication, to its source and to its recipients both." *Va. State Bd. of Pharm.*, 425 U.S. at 756 (footnote omitted). Our own jurisprudence likewise maintains that "where one enjoys a right to speak, others hold a 'reciprocal right to receive' that speech, which 'may be asserted' in court." *Pa. Family Inst., Inc. v. Black*, 489 F.3d 156, 165-66 (3d Cir. 2007) ("In determining standing, the right to listen depends entirely on the infringement on the rights of a willing speaker."). Interestingly, while courts have sometimes cast the right to listen in the mold of "the media's right to gather news," *see, e.g.*, *Daily Herald Co. v. Munro*, 838 F.2d 380, 384 (9th Cir. 1988), that is merely a matter of semantics — those cases still dealt with questions of speech and the forum analysis.

[10] We take this opportunity to make explicit that which has been implicit in our preceding discussion: A polling place is a nonpublic forum. *See Burson*, 504 U.S. at 201-06 (plurality) (discussing the history of voting and the long-evolving pattern of laws limiting expression in and access to the polling place); *id.* at 216 (Scalia, J., concurring) ("It is doctrinally less confusing to acknowledge that the environs of a polling place, on election day, are simply not a 'traditional public forum' — which means that they are subject to speech

countenance such a course of action. *See Smith v. Daily Mail Publ'g Co.*, 443 U.S. 97, 104 (1979) ("A free press cannot be made to rely solely upon the sufferance of government to supply it with information.").[11]

---

restrictions that are reasonable and viewpoint neutral."); *Marlin v. D.C. Bd. of Elections & Ethics*, 236 F.3d 716 (D.C. Cir. 2001) ("The forum here, the interior of a polling place, is neither a traditional public forum nor a government-designated one. It is not available for general public discourse of any sort." (citing *Burson*, 504 U.S. at 201-06)); *see also United Food & Commercial Workers Local 1099 v. City of Sidney*, 364 F.3d 738, 749-50 (6th Cir. 2004); *Cotz v. Mastroeni*, 476 F. Supp. 2d 332, 364 (S.D.N.Y. 2007) ("Polling places clearly are non-public fora and voters present are subject to various First Amendment restrictions, including those based on content."). Despite Appellant's conclusory statement in its Amended Complaint that "[a] polling place is a traditional public forum under the First Amendment of the United States Constitution," (App. at 80a), the weight of precedent holds that it is not. Moreover, Appellant can point to no conduct on the part of the Commonwealth — neither in its policy nor its practice — that would suggest an intent to designate the polling place otherwise. *Cornelius*, 473 U.S. at 802 (O'Connor, J.) (noting that "[t]he government does not create a public forum by inaction or by permitting limited discourse").

[11] As our discussion above should make clear: the right of access is distinct from the right to free speech. Thus, where the First Amendment does not protect a right of access to a particular proceeding, this fact has no bearing on any constitutional protections for expressive speech at the same

16

For this reason, we consider Appellant's citation to cases such as *Munro*, which focused on exit-polling, to be of little help. *Daily Herald Co. v. Munro*, 838 F.2d 380, 382 (9th Cir. 1988). The act of exit-polling has been held by our sister circuits to constitute protected expressive speech. *See, e.g.*, *id.* at 384 ("The media plaintiffs' exit polling constitutes speech protected by the First Amendment, not only in that the information disseminated based on the polls is speech, but also in that the process of obtaining the information requires a discussion between pollster and voter."). The analysis that these courts apply to laws curtailing exit-polling activities — *i.e.*, the traditional forum analysis — is therefore distinct from what is necessary here.

Appellant also urges that the instant case should be evaluated under the rubric of a prior restraint. We disagree. While it is true that restricting access to information may work a prior restraint on speech, *see In re Express-News Corp.*, 695 F.2d 807, 810 (5th Cir. 1982); *United States v. Sherman*, 581 F.2d 1358, 1361 (9th Cir. 1978), this principle is not unlimited. For

> [i]t is one thing to say that a journalist is free to seek out sources of information not available to members of the general public, that he is entitled to some constitutional protection of the confidentiality of such sources, and that the

proceeding. For instance, even if we find no constitutional protection for a right of access to the polling place, this would not absolve courts from undertaking a traditional forum analysis in determining whether an individual has the right to speak inside of the polling place.

17

> government cannot restrain the publication of news emanating from such sources. It is quite another thing to suggest that the Constitution imposes upon government the affirmative duty to make available to journalists sources of information not available to members of the public generally. This proposition finds no support in the words of the Constitution or in any decision of this Court.

*Pell,* 417 U.S. at 834-35 (1974) (citing, among others, *N.Y. Times Co. v. United States*, 403 U.S. 713 (1971)). Thus, the case at hand does not implicate the "kind of classic prior restraint that requires exacting First Amendment scrutiny." *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 32-34 (1984); *see also United States v. Cianfrani*, 573 F.2d 835, 861 (3d Cir. 1978) (holding that there was "[n]o prior restraint . . . involved" where the court imposed restrictions on information adduced at a pre-trial suppression hearing).[12]

---

[12] We do not come to this conclusion lightly. Systems of prior restraint are rightly considered to be antithetical to the Constitution and thereby come before the courts "bearing a heavy presumption against [their] constitutional validity." *N.Y. Times Co. v. United States*, 403 U.S. at 714; *see also Mills v. Alabama*, 384 U.S. 214, 219 (1966) ("It is difficult to conceive of a more obvious and flagrant abridgement of the constitutionally guaranteed freedom of the press [than a restraint on the publication of editorials]."). But "[t]he phrase 'prior restraint' is not a self-wielding sword. Nor can it serve as a talismanic test." *Kingsley Books, Inc. v. Brown*, 354 U.S. 436, 441 (1957). We find that the instant case — where the law concerns only access (not even subsequent use) to already

For this reason, we distinguish those cases cited by Appellant that concern court orders prohibiting members of the press (and others) from contacting jurors. *See, e.g.*, *In re Express-News Corp.*, 695 F.2d 807; *Sherman*, 581 F.2d 1358. Here, the government is not restricting access to information per se; rather it is restricting access to a particular proceeding (i.e., the voting process that occurs inside polling places). Unlike the juror-interview cases, therefore, Appellant is free to contact voters and individuals working in a polling place in order to obtain information about the goings-on inside. There is no blanket gag order curtailing access to this information.[13]

---

nonpublic information — does not necessarily implicate the exacting constitutional scrutiny reserved for evaluating prior restraints.

[13] We have also defined the right of access as being distinct from the right of publication (which, as explained below, is a particular kind of prior restraint):

> The obvious must also be stated. The Coalition's claims are based on an alleged right of access, not a right of publication. Although both have their roots in the First Amendment, these principles are doctrinally discrete, and precedents in one area may not be indiscriminately applied to the other. In general, the right of publication is the broader of the two, and in most instances, publication may not be constitutionally prohibited even though access to the particular information may properly be denied.

Instead, we find that the analysis in this case turns on the question of whether the source of information (here, access to the polling place) should be "available to members of the public generally." Thus, we must determine the proper analytical framework for evaluating this question. As the discussion below demonstrates, the matter here concerns information about government bodies, their processes, and their decisions. As such, our analysis of the public's right to access the source of this information turns on both historical and structural considerations. We must balance the interests of the government on the one hand and those of the press and public on the other.

### C. The Right of Access in the Supreme Court: The Experience and Logic Test

The Supreme Court has suggested that the existence of a First Amendment right to gather news (*i.e.*, the right of access to the source of information or a government process) is best evaluated via a balancing test. The necessity of such a test was first noted in *Branzburg v. Hayes*, where a reporter had claimed that testifying before a grand jury about confidential sources would violate his right to gather news. 408 U.S. 665. A plurality of the Court acknowledged that, "without some [First Amendment] protection for seeking out the news, freedom of the press could be eviscerated." *Id.* at 681. On the other hand, the plurality did not believe that this protection for news-gathering extended endlessly. *Id.* at 681-83 ("[The press] has no special immunity from the application of general laws [and] no special privilege to invade the rights

*First Amendment Coal. v. Judicial Inquiry and Review Bd.*, 784 F.2d 467, 471-72 (3d Cir. 1986).

20

and liberties of others."). Thus, they affirmed the principle that the press is not guaranteed a "constitutional right of special access to information not available to the public generally." *Id.* at 684 (citing, inter alia, *Zemel*, 381 U.S. at 16-17, and *N.Y. Times Co. v. United States*, 403 U.S. at 728-30 (Stewart, J., concurring)).

Having set the operative framework, the plurality then engaged in a balancing inquiry to determine which set of rights should prevail. In his concurrence, Justice Powell summarized the sentiment of the plurality and his own position: "The asserted claim to privilege should be judged on its facts by the striking of a proper balance between freedom of the press and the obligation of all citizens to give relevant testimony with respect to criminal conduct." *Id.* at 710. He added that "[t]he balance of these vital constitutional and societal interests on a case-by-case basis accords with the tried and traditional way of adjudicating such questions." *Id.*

Subsequently, the Court embarked on a similar balancing inquiry to uphold a California Department of Corrections regulation that prohibited the press and others from interviewing specific inmates. *See Pell*, 417 U.S. at 831-32. Prior to the enactment of the regulation in question, journalists "had virtually free access to interview any individual inmate" while non-press members of the public did not benefit from such an unrestricted visitation policy. *Id.* at 831. Journalists claimed that the new regulation, by limiting their news gathering activities, violated the First Amendment protections for freedom of the press. *Id.* at 820-21. Holding that the press does not enjoy any greater constitutional protection than does the general public, the Court ultimately agreed with the prison administrators that the interest in preserving security in the prisons outweighed the press's right

21

to gather news, partly based on the fact that the press had an alternative means of obtaining this information.  *Id.* at 829-34.

But while the opinions in *Branzburg* and *Pell* presented an ad hoc approach, the case of *Richmond Newspapers, Inc. v. Virginia* suggested a more standardized framework for evaluating the right of access to information about government processes.  448 U.S. 555 (1980) (plurality). In that case, reporters sought access to a courtroom that had been closed to the public to prevent undue dissemination of witness-related information, arguing that there were less restrictive means for ensuring a fair trial.  The plurality reaffirmed the First Amendment's protection of the press and recognized that the First Amendment necessarily also "'prohibit[ed] government from limiting the stock of information from which members of the public may draw.'" *Id.* at 575-76 (quoting *First Nat'l Bank of Boston v. Bellotti*, 435 U.S. 765, 783 (1978)).  Finding that access to trials could not be "foreclosed arbitrarily," the *Richmond Newspapers* opinion suggested the framework for a more meaningful test on restrictions in nonpublic fora such as a courtroom.  *Id.* at 577.

The plurality acknowledged that courtrooms were nonpublic fora, but recognized the important role of their historical openness to the public — namely, that the public provides the oversight necessary to maintain the integrity of the judicial process.  *Id.* at 573 n.9.  As for the prison cases (e.g., *Pell*), the plurality distinguished them on the ground that trials were traditionally open to the public whereas prisons were not.  *Id.* at 576 n.11.  In addition to this historical tradition of openness, the plurality also noted that the presence of the public and its representatives "historically

22

has been thought to enhance the integrity and quality of what takes place" in the courtroom. *Id.* at 578.

Justice Brennan, writing in a concurrence, summarized "two helpful principles" drawn from the plurality's opinion:

> First, the case for a right of access has special force when drawn from an enduring and vital tradition of public entree to particular proceedings or information. Such a tradition commands respect in part because the Constitution carries the gloss of history. More importantly, a tradition of accessibility implies the favorable judgment of experience. Second, the value of access must be measured in specifics. Analysis is not advanced by rhetorical statements that all information bears upon public issues; what is crucial in individual cases is whether access to a particular government process is important in terms of that very process.

*Id.* at 589 (citation omitted) (Brennan, J., concurring). This distillation — effectively juxtaposing the People's historical practice of and interest in monitoring government with the State's historical practice of and interest in keeping certain information from public view — formed the basis for what has become the Court's balancing test for evaluating whether a right of access to government information exists.

Indeed, the Court embraced this framework in a subsequent right of access case, *Globe Newspaper Co. v. Superior Court for Norfolk County*, 457 U.S. 596 (1982), where the press sought access to a criminal trial involving the

sexual abuse of underage victims. Writing for the majority, Justice Brennan explained why a right of access attached to criminal trials:

> First, the criminal trial historically has been open to the press and general public. . . . And since that time the presumption of openness has remained secure. . . . Second, the right of access to criminal trials plays a particularly significant role in the functioning of the judicial process and the government as a whole. . . . *In sum, the institutional value of the open criminal trial is recognized in both logic and experience*.

*Id.* at 605-06 (emphasis added). Finding that both factors weighed heavily in favor of openness, the Court in *Globe* held that the press had a qualified right of access because the right to access criminal trials is "of constitutional stature." *Id.* at 606. Consequently, the Court held that the government could restrict access to criminal trials only if the restriction was necessitated "by a compelling governmental interest, and [was] narrowly tailored to serve that interest." *Id.* at 606-07.

Arguably the most complete statement of the Court's balancing test came in *Press-Enterprise Co. v. Superior Court of California for Riverside County*, 478 U.S. 1 (1986), in which the Supreme Court considered the right of access to preliminary hearings in criminal trials. The Court held that a right of First Amendment access requires a two-prong evaluation of "whether the place and process have historically been open to the press" and "whether public access plays a significant positive role in the functioning of the particular process in question." *Id.* at 8. Where both prongs of the test

24

are satisfied, "a qualified First Amendment right of public access attaches." *Id.* at 9.

These three cases — *Richmond Newspapers*, *Globe*, and *Press-Enterprise* — set out a balancing test for evaluating whether a right of access to information about government bodies, their processes, and their decision exists. This framework, referred to either as the *Richmond Newspapers* test or the "experience and logic" test, balances the interests of the People in observing and monitoring the functions of their government against the government's interest and/or long-standing historical practice of keeping certain information from public scrutiny. If a right of access exists, any restraint on that right is then evaluated under strict scrutiny. *See Globe*, 457 U.S. 606-07.

Our Circuit has also applied the *Richmond Newspapers* balancing test in various contexts. While the Supreme Court decisions discussed above largely cabin the test's application to situations addressing criminal proceedings, our own jurisprudence demonstrates a willingness to apply the test more broadly. Still, we have never applied *Richmond Newspapers* to a polling place or to the process of voting. As such, it is a matter of first impression. Thus, our focus is on the appropriate scope and application of the test. We look to our prior decisions for guidance.

## D.    The Experience and Logic Test in the Third Circuit

In *Publicker Industries, Inc. v. Cohen*, 733 F.2d 1059 (3d Cir. 1984), we expanded the application of *Richmond Newspapers* to civil trials. We reasoned that "[t]he Supreme Court's recognition of a First Amendment right of access to *criminal* trials is predicated on 'the common understanding

that a major purpose of that Amendment was to protect the free discussion of governmental affairs,'" and that, in civil trials, too, the "public right of access . . . is inherent in the nature of our democratic form of government." *Id.* at 1068-69 (emphasis added) (quoting *Globe*, 457 U.S. at 604).

Two years later, in *First Amendment Coalition v. Judicial Inquiry and Review Board*, 784 F.2d 467 (3d Cir. 1986), we considered a right of access claim to records of Pennsylvania's Judicial Inquiry and Review Board. Assuming that a right of access *did* exist, we considered the point at which this right attached under *Richmond Newspapers*. *See id.* at 472; *see also North Jersey Media Group, Inc. v. Ashcroft*, 308 F.3d 198, 208 (3d Cir. 2002) (reading *First Amendment Coalition* as applying the "experience and logic" test). While we ultimately noted that Board proceedings did not "have a long history of openness," the case illustrates our willingness to expand the application of the *Richmond Newspapers* framework beyond litigation proceedings. *First Amendment Coal.*, 784 F.2d at 472; *see also id.* at 481 (Adams, J., concurring in part and dissenting in part) (arguing that "[t]he correct legal analysis here flows in large measure from the historical record" and the standards set forth in *Globe* and *Press-Enterprise*).[14]

---

[14] We have also extended the "experience and logic" analysis to other portions of the criminal trial process. *See, e.g.*, *United States v. Smith*, 776 F.2d 1104, 1111-12 (3d Cir. 1985) (determining, by "employing the historical and structural analysis mandated by [*Richmond Newspapers*, *Globe* and *Press-Enterprise*], whether there is a First Amendment right of access to indictments. Although those cases concerned access to judicial proceedings, no reason

*Capital Cities Media, Inc. v. Chester*, 797 F.2d 1164 (3d Cir. 1986) (en banc), decided the same year as *First Amendment Coalition*, stands as a watershed case. That proceeding concerned a claimed right of access to certain administrative records held by the Pennsylvania Department of Environmental Resources ("D.E.R."). We concluded that *Richmond Newspapers*, *Globe* and *Press-Enterprise* "hold no more than that the government may not close government proceedings which historically have been open" except where "public access contributes nothing of significant value to that process or [where] there is a compelling state interest in closure and a carefully tailored resolution of the conflict between that interest and First Amendment concerns." *Id.* at 1173. In effect, we held that the three cases do no more than set forth the generalized "experience and logic" test for evaluating the right of access to traditionally open government proceedings. *Id.* at 1174-76.

Moreover, in evaluating the existence of the right to access D.E.R. files, we were cognizant of the fact that the Supreme Court had not yet applied the "experience and logic" test "to the context of executive branch files." *Id.* at 1174. Nevertheless, we assumed, without deciding, that the test applied to such information and proceeded with our evaluation. *Id.* at 1174-75; *see also id.* at 1177-78 (Adams, J., concurring). *Capital Cities* therefore stands as the broadest suggested application of the "experience and logic" test, arguing that it can be applied beyond the limited context of criminal and civil trials to cover a greater expanse of

---

occurs to us why their analysis does not apply as well to judicial documents . . . ").

information related to government bodies, their processes, and decisions.[15]

Our willingness to apply the "experience and logic" test beyond judicial proceedings was once again evidenced in *Whiteland Woods, L.P. v. Township of West Whiteland*, 193 F.3d 177 (3d Cir. 1999). In that case, we considered whether a private enterprise, rather than a newspaper, had a First Amendment right to videotape "a meeting of the Township Planning Commission." *Id.* at 178. In dicta, and relying on *Globe*, we reasoned that "[b]ecause a 'major purpose of the First Amendment was to protect the free discussion of governmental affairs,' the public and press have the right to

---

[15] We recognize the very real concerns our colleagues raised in their dissent from *Capital Cities*:

> The question . . . is whether government may, consistent with the speech-press clause, without offering any justification whatever for doing so, impose the ultimate prior restraint of imposed ignorance about its affairs simply by refusing access to information in the possession of public officials. The majority holds that it may. The governing case law quite plainly is otherwise.

*Capital Cities*, 797 F.2d at 1186-87 (Gibbons, J., et al., dissenting). Here, we expressly do not reach the issue of whether — even in light of *Capital Cities* — the "experience and logic" test is appropriately applied to cases addressing access to legislative or executive records. That case is for another day.

attend certain types of governmental proceedings." *Id.* at 180 (citation omitted) (quoting *Globe*, 457 U.S. at 604). Consequently, we felt "no hesitation in holding Whiteland Woods had a constitutional right of access to the Planning Commission," explaining that "[w]hether the public has a First Amendment right of access to a particular government proceeding depends on" the outcome of the experience and logic test. *Id.* at 180-81 (citing *Capital Cities*, 797 F.2d at 1174); *see also North Jersey*, 308 F.3d at 214 (noting that the right of access discussion in *Whiteland* is dicta).

All of the decisions discussed above informed our analysis in *North Jersey Media Group, Inc. v. Ashcroft*, a case in which we focused on the media's right of access to deportation proceedings. 308 F.3d 199. In defending its restriction, the government argued that "the absence of an explicit guarantee of access for Article I and II proceedings . . . gives rise to a distinction with a difference because, without an incorporating provision parallel to the Sixth Amendment, the Framers must have intended to deny the public access to political proceedings." *North Jersey*, 308 F.3d at 207. "Our own jurisprudence preclude[d] this" result, *id.* at 207, and we held that "experience and logic" "is a test *broadly applicable to issues of access to government proceedings*, including removal," *id.* at 208-09 (emphasis added).[16]

---

[16] As it relates to our ruling in *North Jersey*, it bears repeating that the existence or non-existence of a Sixth Amendment-like provision relating to a particular government proceeding is not necessary for the satisfaction of the "experience and logic" test. Thus, in *North Jersey*, we noted that "[t]here is no suggestion [in *Richmond*

29

### E. The Experience and Logic Test is Applicable to Polling Places

Considering the full sweep of our jurisprudence, we now hold that the experience and logic test articulated in *Richmond Newspapers* is applicable to the voting process. Indeed, an extension of the "experience and logic" test to the polling place is in line with the general trend of our decisional authority: that access to government proceedings — in effect, access to information about governmental bodies and their actions or decisions — must be evaluated with an eye toward the historical and structural role of the proceeding. *North Jersey* and *Whiteland* are particularly instructive in this regard.

In *North Jersey*, we held that the "experience and logic" test applies to government proceedings under Articles I and II of the Constitution. Such proceedings include, among other things, the process of voting. While it does not set forth the exact nature of the proceeding, Article I of the Constitution states that "[t]he Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of chusing Senators." U.S. Const. art. I, § 4, cl. 1. Moreover, Article II declares that "[e]ach State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors, equal to the whole

*Newspapers*] that the Sixth Amendment is crucial to the right of access; indeed, this passage merely states that the Framers assumed a common and established practice." *North Jersey*, 308 F.3d at 208.

Number of Senators and Representatives to which the State may be entitled in the Congress." U.S. Const. art. II, § 1, cl. 2. This latter constitutional mandate grants "plenary power to the state legislatures in the matter of the appointment of electors," *McPherson v. Blacker*, 146 U.S. 1, 35 (1892), thereby ensuring that the voting process is, in no uncertain terms, a *governmental process and procedure*.[17]

These mandates to the states are likewise insufficient to escape the searching eye of the "experience and logic" test, for, in *Whiteland*, we applied the test to state-level proceedings (albeit in dicta). *See also First Amendment Coalition*, 784 F.2d at 472 (applying the test to a state judicial discipline board).

Moreover, we believe that this reading of our prior decisions fully satisfies — and, in fact, exemplifies — the balancing inquiry first articulated by Justice Powell in his concurrence in *Branzburg*. There is an internal logic to this test: Where both historical and structural considerations militate against a presumption of openness, the press and public enjoy no *constitutionally protected* right of access. In such cases, the words of Justice Stewart ring true: The press and public "must rely, as so often in our system we must, on the tug and pull of the political forces in American society." *Capital Cities*, 797 F.2d at 1173 (quoting Potter Stewart, *Or of the Press*, 26 Hastings L.J. 631, 636 (1975)).

---

[17] What is more: The process occurring within a polling place, as within a courtroom or a legislative meeting, is created, circumscribed, directed, and controlled by the government. *See* U.S. Const. art. I, § 4, cl. 1.

On the other hand, where history and structure point to a presumption of openness, a qualified First Amendment right attaches, and the government's attempts to cut off access to information is subjected to exacting constitutional scrutiny. *See, e.g.*, *Globe*, 457 U.S. at 606-07; *North Jersey*, 308 F.3d at 217 n.13.

Thus, by engaging in the "experience and logic" inquiry, we preserve the interests of the government to keep private that which always has been and should be private, while recognizing the right of the press and the general public to enter and access traditionally open nonpublic fora and other sources of information about government bodies and their actions or decisions. Where a tradition of openness is found, the test ensures that the government cannot cut off access without subjecting itself to exacting constitutional scrutiny. By applying the experience and logic test, we ensure that the government cannot shroud its activities behind a veil of secrecy merely by banning everyone from a nonpublic forum. To hold otherwise would be to invite inequitable results, and create the possibility of government behavior that frustrates the "'paramount public interest in a free flow of information to the people concerning public officials.'" *Pell*, 417 U.S. at 832 (quoting *Garrison v. Louisiana*, 379 U.S. 64, 77 (1964)).

## F.    Applying the Experience and Logic Test to the Instant Case

Having determined that the "experience and logic" test applies to the voting process, we must now determine whether polling places are presumptively open and whether, as a result, the Appellant — as well as the general public — is

presumptively entitled to a right of access pursuant to the First Amendment.

### 1. The "Experience" Prong

The framework articulated in *Richmond Newspapers* asks us to consider whether a "'place and process have historically been open to the press and general public.'" *North Jersey*, 308 F.3d at 209 (quoting *Press-Enterprise*, 478 U.S. at 8). This analysis begins with a review of historical practices associated with a particular place or process; this inquiry is objective. *See Capital Cities*, 797 F.2d at 1175. Thus, for example, in *Capital Cities* we held that "the relevant historic[al] practice in this case is not specifically that of Pennsylvania's [D.E.R.]" *Id.* Instead, after considering *Richmond Newspapers*, *Globe* and *Press-Enterprise*, we held that "[i]n each of these cases, the Court looked not to the practice of the specific public institution involved, but rather to whether the particular *type* of government proceeding had historically been open in our free society." *Id.* (emphasis added).

To meet this objective standard, the Supreme Court and the Third Circuit have drawn on a plethora of historical sources, including comments made by the Framers, practice at the English court of law, congressional procedures, relevant regulatory schemes, and court decisions. *See, e.g.*, *Richmond Newspapers*, 448 U.S. at 564-73; *Publicker*, 733 F.2d at 1068-70; *North Jersey*, 308 F.3d at 211-15. This wide-ranging inquiry into historical practice is not incidental; the "experience" prong sets a relatively high bar, a point we recognized in *North Jersey*, when we compared the tradition

of open deportation proceedings to the traditions of openness discussed in *Richmond Newspapers* (for criminal trials) and *Publicker* (for civil trials), and held that "deportation hearings [do not] boast a tradition of openness sufficient to satisfy *Richmond Newspapers*." *North Jersey*, 308 F.3d at 212-13; *cf. Richmond Newspapers*, 448 U.S. at 573 n.9 (failing to find "'a single instance of a criminal trial conducted in camera in any federal, state, or municipal court during the history of this country'" (quoting *In re Oliver*, 333 U.S. 257, 266 (1948)); *Publicker*, 733 F.2d at 1059 (noting that a common law right to access civil trials was "beyond dispute").

In contrast to the criminal and civil trial settings, we noted that the "tradition of open deportation hearings is too recent and inconsistent to support a First Amendment right of access." *North Jersey*, 308 F.3d at 211. And while we acknowledged that "a showing of openness at common law is not required" and that "a 1000-year history is unnecessary," we were quick to note our inability to dispense with the "experience" analysis "where history is ambiguous or lacking, [or] to recognize a First Amendment right based solely on the 'logic' inquiry." *Id.* at 213.[18]

---

[18] During our discussion in *North Jersey*, we acknowledged that one of our cases — *United States v. Simone*, 14 F.3d 833 (3d Cir. 1994) — applied the "experience and logic" test without the benefit of a well-established tradition of historical openness. 308 F.3d at 213-14. The *Simone* case centered on a claimed right of access to post-trial examinations of jury misconduct. 14 F.3d 833. In analyzing the "experience" prong of the *Richmond Newspapers* framework, we noted that "[n]either the parties nor this court have been able to find cases dating before 1980

In the case before us, Appellant seeks access to the polling place.[19]  We therefore look to see whether a tradition of openness exists for the polling place and the *process of voting* occurring inside. [20]  Our inquiry includes not just the

in support of either openness or closure for this type of post-trial proceeding.”  *Simone*, 14 F.3d at 838.  While we explicitly stated in *Simone* that our analysis would “rely primarily on the ‘logic’ prong of the test,” we acknowledged that the experience prong was fulfilled by looking to “other phases of the criminal process.”  *Id.*; *see also North Jersey*, 308 F.3d at 214 (acknowledging the peculiar nature of *Simone*).

[19] We reject the argument, proffered by Appellant’s counsel, that a right of access to polling places exists because information about voters is publicly available.  The access Appellant seeks is not to this information; it is to the actual process occurring within the polling place prior to casting a vote.  This crucial distinction also ensures that our decision does not pertain to activities such as exit-polling.

[20] Ordinarily, our case law dictates that the complaint must allege this tradition of openness.  *See Capital Cities*, 797 F.2d at 1175.  In the current matter, we recognize that Appellant has not directly engaged with the “experience and logic” standard and therefore the complaint is relatively devoid of any such allegations.  (As our earlier discussion explains, allegations as to the practices surrounding the specific government agency, process or law at issue are not pertinent.)  However, we believe it is unnecessary to remand the case back to the District Court to give Appellant an opportunity to amend its pleadings.  As the forthcoming analysis will demonstrate, the Supreme Court’s review of

35

act of voting, but also the act of entering the polling place and signing in to vote.

In light of our reasoning that the "experience" inquiry is objective, we begin our analysis with the general voting process. At this level of generality, the Supreme Court's plurality opinion in *Burson* is highly instructive. The facts and legal conclusions of the decision are immaterial for our present purposes; we are instead interested in the plurality's thorough exegesis on the history of voting in America. *See Burson*, 504 U.S. at 200-06. While a full recapitulation is unnecessary, it behooves us to engage in a brief discussion.

In the colonial era, voting was conducted by voice vote — a process freely accessible to the entire public. *Id.* at 200 ("That voting scheme was not a private affair, but an open, public decision, witnessed by all and improperly influenced by some."). As time went on, and the perils of public voice-based voting became apparent, the newly-formed states adopted systems based on the paper ballot. *Id.* Voters would craft their own ballots at home and then bring them to the polls. *Id.* However, the trip between the home and the poll was not a private or protected affair, and the old evils of voice-based voting resurfaced in the form of pre-printed ballots, bribery, and intimidation. *Id.* at 200-01 ("State attempts to standardize the ballots were easily thwarted — the vote buyer could simply place a ballot in the hands of the bribed voter and watch until he placed it in the polling box.").

elections in America presents a well-rounded picture of how restrictions around polling places developed. We therefore think it would be futile for Appellant to try to amend its pleadings.

Under the original ballot-based system, "[a]pproaching the polling place . . . was akin to entering an open auction place. As the elector started his journey to the polls, he was met by various party ticket peddlers 'who were only too anxious to supply him with their party tickets.'" *Id.* at 202 (quoting Eldon Cobb Evans, *A History of the Australian Ballot System in the United States* 9 (1917)).

In the late 1800s, states began adopting "the Australian system" of voting. *Id.* at 203. The new system not only placed all of the candidates on a single ballot, but it also "provided for the erection of polling booths . . . open only to election officials, two 'scrutinees' for each candidate, and electors about to vote." *Id.* at 202. The state laws differed mainly in the size of the exclusionary zone that they created around the polls. *Id.* ("The Massachusetts and New York laws differed somewhat from the previous Acts in that they excluded the general public only from the area encompassed within a guardrail constructed six feet from the voting compartments.").[21] "By 1896, almost 90 percent of the States had adopted the Australian system. This accounted for 92 percent of the national electorate." *Id.* at 204-05.

In his concurrence, Justice Scalia added that "[b]y 1900, at least 34 of the 45 States . . . had enacted such restrictions," and that "most of the statutes banning election-

---

[21] The court noted that "[t]his modification was considered an improvement because it provided additional monitoring by members of the general public and independent candidates, who in most States were not allowed to be represented by separate inspectors." *Burson*, 504 U.S. at 203-04.

day speech near the polling place specified the same distance": 100 feet. *Id.* at 214-15 & n.1 (Scalia, J., concurring) (collecting statutes).

Now, returning our focus to Pennsylvania, we note that the Pennsylvania Constitution mandates that "[a]ll elections by the citizens shall be by ballot or by such other method as may be prescribed by law: Provided, *That secrecy in voting be preserved*." Pa. Const. art. 7, § 4 (emphasis added). Moreover, the provisions in § 3060 limiting access to the polling place were adopted 75 years ago. *See* Act of June 3, 1937, P.L. 1333, No. 320, Art. XVIII, § 1220. While we do not look specifically at whether a tradition of openness exists *in Pennsylvania*, we do find it relevant that Pennsylvania laws and provisions are in line with the historical development discussed by the Supreme Court above.

In light of the foregoing discussion — and our earlier directive that the tradition of openness must be objectively and clearly established — we find that the historical record is insufficient to establish a presumption of openness in the context of the voting process itself. While the act of voting — and the process by which voting was carried out — began its life as a public affair, our Nation's history demonstrates a decided and long-standing trend away from openness, toward a closed electoral process.

## 2.    The "Logic" Prong

The *Richmond Newspapers* framework also tasks us with considering "whether public access plays a significant positive role in the functioning of the particular process in question." *North Jersey*, 308 F.3d at 209 (quoting *Press-*

38

*Enterprise*, 478 U.S. at 8). We have adopted six broad "values" that are typically served by openness:

> [1] promotion of informed discussion of governmental affairs by providing the public with the more complete understanding of the [proceeding]; [2] promotion of the public perception of fairness which can be achieved only by permitting full public view of the proceedings; [3] providing a significant community therapeutic value as an outlet for community concern, hostility and emotion; [4] serving as a check on corrupt practices by exposing the [proceeding] to public scrutiny; [5] enhancement of the performance of all involved; and [6] discouragement of [fraud].

*United States v. Simone*, 14 F.3d 833, 839 (3d Cir. 1994). Of course, these are general categories and the list is by no means exhaustive or mandatory. For the logic prong to be satisfied, it need not be shown that the government process or the general public will benefit in all six ways from press and public access.

In addition to considering the benefits that would result from press and public access, we must "take account of the flip side — the extent to which openness impairs the public good." *North Jersey*, 308 F.3d at 217. Indeed, the logic analysis *must* account for the negative effects of openness, for otherwise "it is difficult to conceive of a government proceeding to which the public would not have a First Amendment right of access." *Id.* ("[P]ublic access to *any* government affair, even internal CIA deliberations, would 'promote informed discussion' among the citizenry. It

39

is unlikely the Supreme Court intended this result."). And while the consideration of potentially detrimental effects is speculative, we have held that "the *Richmond Newspapers* logic prong is unavoidably speculative." *Id.* at 219.

Finally, we note that a necessary corollary to the "experience" prong being an objective inquiry is that the "logic" prong is likewise an objective inquiry. To hold otherwise would lead to untenable consequences: First Amendment rights of access would not only vary from venue to venue, but they would be subject to a kind of arbitrary examination that is anathema to our system of defined constitutional rights.

In the case before us, we begin by noting the rather obvious fact that openness of the voting process helps prevent election fraud, voter intimidation, and various other kinds of electoral evils. "[S]unlight," as has so often been observed, "is the most powerful of all disinfectants." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 305 (1964). Of course, in situations where the press is not geographically far removed from the proceedings anyway, the benefits of additional oversight are inversely proportional to the distance of the press. The situation in Pennsylvania is a fine example: The press (like the general public) is only 10 feet away from the polling place, and we have no tangible or discernible evidence of how the public good would benefit so much more from the press being *inside* the room, rather than several paces away.[22]

---

[22] At oral argument it became apparent that the press could simply stand at the 10-foot mark, point their cameras inside the polling place — which we note again is just the *room* designated for voting — and begin to record the

40

Appellant argues that access to the polling place was particularly necessary during this past election because of the Voter ID Law. More specifically, Appellant argues that the Voter ID Law — part of which was suspended for purposes of the November 6, 2012 election — may have caused voter confusion as to whether identification is required in order to cast a vote. As a result, Appellant argues that it was of the utmost importance for reporters to observe and record the goings on *at the sign-in table* during this election. We agree that openness in a situation where new legislation is being implemented or tested would generally serve the public good. It implicates several of the broad categories recognized in *Simone*, including the "promotion of informed discussion of governmental affairs by providing the public with [a] more complete understanding of the [proceeding]." *Simone*, 14 F.3d at 839. We therefore consider this as a factor weighing in favor of satisfying the "logic" prong.[23]

The experience and logic test requires that we also examine the potential dangers inherent in openness. Of

_____

activity. Counsel for Appellee conceded that this would be permissible, and counsel for Appellant had no satisfactory response as to how or why this procedure would not serve the Appellant's interest.

[23] The weight we accord to this fact in our inquiry under the logic prong would be different if the Voter ID Law actually had been implemented; indeed, our entire analysis of the "experience and logic" test could be different. However, that case is not before us, and we decline to speculate regarding its effect. As both parties concede, November 6, 2012 represented only a "soft test" of its implementation.

41

greatest concern to us is that access for one is access for all. While Appellant urges that *its* reporters should be permitted to access the polling place for purposes of gathering news, there is no constitutionally valid way of limiting the right of access *only* to Appellant. Finding a right of access for one member of the press necessarily means that all other members of the press must or should share in that right.

This brings us to the next concern, raised at oral argument: Who is a member of the press? Even if we were inclined to find a special First Amendment right for the press in this case (which we explicitly refuse to do), the class of persons to whom such a right is applicable is almost boundless. Counsel for Appellant could not divine a way to confine the potential beneficiaries of a ruling in its favor.[24]

Moreover, there is a very real possibility that the presence of reporters during the sign-in period, when

---

[24] More recently, membership in the Fourth Estate has been democratized. Access to blogs, smartphones, and an extensive network of social media sites (not the least of which are Twitter and Facebook) have transformed all of us into potential members of the media. While in almost any other situation this would be a boon to a free and democratic society, in the context of the voting process, the confusion and chaos that would result from a potentially limitless number of reporters in a polling place would work the opposite effect, potentially creating confusion, frustration, and delay. This is to say nothing of our earlier holding that the rights of access for the press and public are co-extensive. In this situation, *anyone* could record in the polling place if the First Amendment protected the right of access thereto.

42

individuals are necessarily exchanging personal information in preparation for casting a private vote, could concern, intimidate or even turn away potential voters.

On balance then, we find the "logic" prong of this inquiry disfavors finding a constitutionally protected right of access to the voting process. We therefore find that both prongs of the "experience and logic" test militate against finding a right of access in this case. As in *North Jersey*, we note that while the Constitution does not provide protection under the First Amendment, "there is, as always, the powerful check of political accountability." *North Jersey*, 308 F.3d at 220.

## G.  *Beacon Journal* is Unpersuasive

Despite clear indications by the Supreme Court and this Circuit that the experience and logic test is the appropriate analytical framework for the instant dispute, Appellant urges us to follow the Sixth Circuit's conclusion in *Beacon Journal Publishing Co., Inc. v. Blackwell*, 389 F.3d 683 (6th Cir. 2004), a decision whose reasoning is ambiguous at best. We decline to do so.

The *Beacon Journal* court analyzed the constitutionality of an Ohio statute similar to Pennsylvania's § 3060(d) as applied to members of the media. Like § 3060(d), the Ohio law mandated that "[n]o person, not an election official, employee, witness, challenger, or police officer, shall be allowed to enter the polling place during the election, except for the purpose of voting." *Id.* at 684 (quoting Ohio Rev. Code Ann. § 3501.35 (2002)). The Beacon Journal Publishing Company (which published the *Beacon Journal* newspaper) moved for injunctive relief,

arguing that the law "abridg[ed its] First Amendment rights." *Id.* The Sixth Circuit, without fully setting out the basis for its decision, applied strict scrutiny and held that the government had made no showing that the law was "necessary to further the state's [interest in ensuring orderly elections] and 'narrowly drawn to achieve that end.'" *Id.* at 685 (quoting *Perry*, 460 U.S. at 45). It therefore concluded that the Ohio law likely abridged the freedom of the press, and ordered that the injunction be granted and that the state "immediately and forthwith permit [Beacon Journal] to have reasonable access to any polling place for the purpose of news-gathering and reporting so long as [Beacon Journal does] not interfere with poll workers and voters as voters exercise their right to vote." *Id.*

*Beacon Journal*'s citation to *Perry* for the strict scrutiny standard is telling (and troubling). The *Perry* case, which concerned a law regulating expressive activity in a public school, formulated its analysis this way: "The existence of a *right of access* to public property and the standard by which limitations upon such a right must be evaluated differ depending on the character of the property at issue." *Perry*, 460 U.S. at 44 (emphasis added). As we have explained above, the "right of access" at issue in *Perry* concerned access to a forum for speech purposes. The right at issue in this case (and in *Beacon Journal*) is different — it concerns the right of access to a government proceeding for news-gathering purposes.

Moreover, in applying a forum analysis, the Sixth Circuit apparently took the polling place to be a public forum. This is incorrect and stands adverse to both Supreme Court precedent and our precedent. As we have just held: a polling place is a nonpublic forum, requiring the government to

44

satisfy only a reasonableness analysis. Therein lies our discord with the *Beacon Journal* ruling. As our foregoing discussion demonstrates, adopting a traditional forum analysis for cases such as the one at bar sets a dangerous precedent which permits the government too much freedom to hide their activities from the public's view. We cannot accept this result. *Beacon Journal* is a precedent we cannot follow.[25]

As there is no protected First Amendment right of access to a polling place for news-gathering purposes, we find that Appellant has failed to state a claim and affirm the District Court's dismissal of Count I.

## IV.    Equal Protection

Appellant also alleges that the Commonwealth's application of § 3060(d), forbidding it from entering polling places in Allegheny and Beaver Counties, violates the Equal Protection Clause. Appellant asserts that the Boards of Elections in Pennsylvania counties other than Allegheny and Beaver counties permit reporters to enter the polling place and take photographs or otherwise record the proceedings. Appellant supports its claim by pointing to a host of

---

[25] We note also that in rejecting *Beacon Journal* we are not disagreeing with any of our other sister circuits. The *Beacon Journal* decision seems to stand alone, even within the Sixth Circuit. Indeed, in the eight years since the decision (a span of time which covered four national elections), only one court in the entire country has cited *Beacon Journal* for its holding regarding the right of access: the District Court opinion in this case. *PG Publ'g Co.*, 2012 WL 4796017, at *25.

photographs taken by other Pennsylvania newspapers inside polling places. Additionally, Appellant claims that officials in Allegheny County have on previous occasions permitted the media (presumably including Appellant's own reporters) entry into the polling place to photograph "certain public figures" during the voting process. On the basis of these allegations, Appellant urges that it was and is being discriminated against in violation of the Equal Protection Clause.

Appellee does not dispute that § 3060(d) is selectively enforced across the Commonwealth. Indeed, Appellee conceded as much during oral argument. Instead, Appellee argues that the alleged selective enforcement of § 3060(d) cannot sustain an equal protection claim and that any disparate enforcement comes from the structure of the Commonwealth's electoral process. That is, Appellee asserts that each Board of Elections operates in complete autonomy, and therefore, the decisions of one cannot be compared to the decisions of the others.[26]

For the reasons discussed below, we agree with Appellee that the selective enforcement of § 3060(d) does not

---

[26] By contrast, Appellant alleges that the "the *Commonwealth*, through its political subdivisions," violated the Equal Protection Clause. As a necessary consequence, Appellant argues that every instance of enforcement or non-enforcement of § 3060(d) can be attributed directly to the Commonwealth as a whole and, by extension, the Secretary for the Commonwealth of Pennsylvania (Appellee). We need not reach this argument for Appellant's claim is properly disposed of on other grounds.

46

give rise to a claim under the Equal Protection Clause. Consequently, we hold that the District Court rightfully dismissed Appellant's claim.

## A.    The "Class of One" Argument

The Fourteenth Amendment dictates that a state may not "deny to any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV. The purpose of this clause is "to secure every person within the State's jurisdiction against intentional and arbitrary discrimination, whether occasioned by express terms of a statute or by its improper execution through duly constituted agents." *Vill. of Willowbrook v. Olech*, 528 U.S. 562, 564 (2000) (quoting *Sioux City Bridge Co. v. Dakota Cnty.*, 260 U.S. 441, 445 (1923)). Where a litigant asserts a so-called "class of one" Equal Protection challenge, alleging that the litigant itself, and not a particular group, was the subject of discriminatory treatment under a particular law, we have required the litigant to allege "that she has been intentionally treated differently from others similarly situated and that there is no rational basis for the difference in treatment." *Marcavage v. Nat'l Park Serv.*, 666 F.3d 856, 860 (3d Cir. 2012) (quoting *Vill. of Willowbrook*, 528 U.S. at 564).

The allegations presented in Appellant's Complaint do not demonstrate that Appellant was "intentionally treated differently" from other newspapers in Pennsylvania. In fact, the Complaint fails to present a single example where another newspaper sought and obtained access to a polling place in a location where Appellant could not. As the District Court recognized, "[t]he facts alleged by [Appellant] suggest only that employees of the *Post-Gazette* unsuccessfully sought to enter polling places located in counties where § 3060(d) is

47

enforced, and that employees of other newspapers were allowed to enter polling places in counties where § 3060(d) is not enforced." *PG Publ'g Co.*, 2012 WL 4796017, at *29. Still, we must delve deeper, for Appellant urges us that it has alleged a scheme of selective enforcement sufficient to implicate the Equal Protection Clause.

## B.    The "Selective Enforcement" Argument

The Equal Protection Clause prohibits the "selective enforcement" of a law based on an unjustifiable standard. *Thomas v. Independence Twp.*, 463 F.3d 285, 297 (3d Cir. 2006); *see also United States v. Batchelder*, 442 U.S. 114, 125 n.9 (1979). Thus, to establish a selective-enforcement claim, Appellant must demonstrate: "(1) that [it] was treated differently from other similarly situated [entities], and (2) 'that this selective treatment was based on an unjustifiable standard, such as race, or religion, or some other arbitrary factor, . . . or to prevent the exercise of a fundamental right.'" *Dique v. N.J. State Police*, 603 F.3d 181, 184 n.5 (3d Cir. 2010) (quoting *Hill v. City of Scranton*, 411 F.3d 118, 125 (3d Cir. 2005)). To maintain its equal protection claim, Appellant must show not only that the administration of § 3060(d) has resulted in "unequal application to those who are entitled to be treated alike," but also that there is "an element of intentional or purposeful discrimination" present. *Snowden v. Hughes*, 321 U.S. 1, 8 (1944); *see also Jewish Home of E. Pa. v. Ctrs. for Medicare and Medicaid Servs.*, 693 F.3d 359, 363 (3d Cir. 2012) ("[T]o maintain an equal protection claim of this sort, [plaintiff] must provide evidence of discriminatory purpose, not mere unequal treatment or adverse effect.").

Here, we find that Appellant has failed to set forth the necessary allegations. Even if we accept all of Appellant's

allegations at face value, as we must, we see no sign of "clear and intentional discrimination." *Snowden*, 321 U.S. at 8 (internal quotation marks omitted). The Complaint demonstrates only that in some instances, reporters from newspapers in some counties were permitted into the polling place, while reporters in other counties were not. This is insufficient to allege a systemic discriminatory purpose. *Accord Jewish Home*, 693 F.3d at 363 (finding no "[s]elective discriminatory enforcement" where facts demonstrated only that some facilities were penalized less often than plaintiff). The law cannot provide a constitutional remedy for every situation where a party may feel slighted; claims appealing to the Equal Protection Clause must meet a higher bar.

## C. The "Inconsistent Application" Argument

Finally, we address Appellant's allegation that, in the past, reporters were permitted to enter polling places and photograph elected officials casting their votes. It is well-established that "the conscious exercise of some selectivity in enforcement [of a law] is not in itself a federal constitutional violation." *Oyler v. Boles*, 368 U.S. 448, 456 (1962); *see also Gov't of Virgin Islands v. Harrigan*, 791 F.2d 34, 35 (3d Cir. 1986) ("A prosecutor is not bound to use the habitual criminal statute in every case to which it could be applied.").

Here, the issue lies not in the inconsistent application of the statute to Appellants, but in the absence of any allegations suggesting some invidious intent. Appellant has not set forth sufficient factual allegations to allow this Court to draw the reasonable inference that the disparate treatment of Appellant's own reporters was occasioned by some specific agenda aimed at discriminating against Appellant's

personnel in particular.[27]  To hold, without more, that the on-again/off-again enforcement of § 3060(d) amounts to an Equal Protection Clause violation would unduly — and imprudently — expand the reach of the Clause.  We decline to do so, and instead affirm the District Court.

## V.    The Consent Decree

We now come to the Consent Order.  Appellant argues that the District Court erred in refusing to enter the Order.  Appellant argues that the parties in a litigation may agree to any relief that is "within the general scope of the case made by the pleadings."  *Pac. R.R. v. Ketchum*, 101 U.S. 289, 297 (1879).  Given that this court is not "necessarily barred from entering a consent decree . . . [that] provides broader relief than the court could have awarded after a trial," *Local No. 93, Int'l Ass'n of Firefighters, AFL-CIO v. City of Cleveland*, 478 U.S. 501, 525 (1986), Appellant urges that the parties to the Consent Order should "obtain the injunctive benefits of the settlement agreement they negotiated," *Carson v. Am. Brands, Inc.*, 450 U.S. 79, 89 (1981).   In light of our discussion regarding the constitutionality of § 3060(d), we hold that the court below did not abuse its discretion in refusing to enter the consent decree.

Consent decrees — such as the Consent Order — have "elements of both contracts and judicial decrees." *Frew v. Hawkins*, 540 U.S. 431, 437 (2004).  Thus, a consent decree

---

[27] For example, Appellant presents no allegations that its reporters were barred from the polling place for printing news items or editorials that were critical of the government. *See Capital Cities*, 797 F.2d at 1176.

represents "'an agreement that the parties desire and expect will be reflected in, and be enforceable as, a judicial decree that is subject to the rules generally applicable to other judgments and decrees.'" *Id.* (quoting *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 378 (1992)). Consequently, the parties cannot circumvent valid state laws by way of a consent decree. *See, e.g.*, *Perkins v. City of Chicago Heights*, 47 F.3d 212, 216 (7th Cir. 1995) ("While parties can settle their litigation with consent decrees, they cannot agree to 'disregard valid state laws . . . .'"); *St. Charles Tower, Inc. v. Kurtz*, 643 F.3d 264, 270 (8th Cir. 2011) (holding that a state court can approve a consent order "overrid[ing] state law" only where there exists a "federal constitutional or statutory violation").[28]

As our foregoing analysis of Appellant's First Amendment and Equal Protection Clause claims demonstrates, § 3060(d) does not give rise to a violation of federal statutory or constitutional law and is therefore a valid state statute. Thus, the District Court did not err in refusing to enter a consent decree that would violate a valid state law.[29]

---

[28] *See also Soc'y Hill Civic Ass'n v. Harris*, 632 F.2d 1045, 1060 (3d Cir. 1980) ("A consent decree need not in explicit terms require that the actions specified therein shall be carried out in conformity with all applicable federal, state and local law. It is sufficient if it does not authorize or require conduct in violation of the law."), *overruled on other grounds by Martin v. Wilks*, 490 U.S. 755, 762 n.3 (1989).

[29] Appellant argues that the District Court improperly held that the Board of Elections' authority did not allow it to

## VI. Conclusion

For the reasons discussed above, we will affirm the District Court's decision to grant Appellee's motion to dismiss and hold it did not abuse its discretion in refusing to enter the Consent Order.

---

enter into a consent decree that contravened valid state law. Instead, Appellant avers that the Board's "broad discretion" permits it to "issue rules and regulations for the guidance of election officers," which in turn permits it to enter into this particular consent decree. (Appellant's Br. at 33-34.) Assuming, *arguendo*, Appellant's position, we still find that the District Court did not abuse its discretion. Regardless of what the Allegheny County Board of Elections' authority may entail, Appellant does not — and likely cannot — maintain that it extends to overriding an existing state law. Even if the Board may choose not to apply the law, § 3060(d) would still remain a valid state statute, and the District Court cannot lend its imprimatur to an order that would sanction its contravention. *See, e.g.*, *Perkins*, 47 F.3d at 216 (holding that parties to a consent decree "cannot consent to do something together that they lack the power to do individually"); *Keith v. Volpe*, 118 F.3d 1386, 1393 (9th Cir. 1997) (holding that parties to a consent decree cannot "agree to terms which would exceed their authority and supplant state law").