PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 12-3859
_____

DELAWARE COALITION FOR OPEN GOVERNMENT,
INC.
v.
THE HONORABLE LEO E. STRINE, JR.;
THE HONORABLE JOHN W. NOBLE;
THE HONORABLE DONALD F. PARSONS, JR.;
THE HONORABLE J. TRAVIS LASTER;
THE HONORABLE SAM GLASSCOCK, III;
THE DELAWARE COURT OF CHANCERY;
THE STATE OF DELAWARE

The Honorable Leo E. Strine, Jr.; The Honorable John W.
Noble; The Honorable Donald Parsons, Jr.; The Honorable J.
Travis Laster; The Honorable Sam Glasscock, III,
                                        *Appellants*

_____
On Appeal from the United States District Court
for the District of Delaware
(D.C. No. 1-11-cv-01015)
District Judge:  Honorable Mary A. McLaughlin

_____
Argued: May 16, 2013
Before: SLOVITER, FUENTES, and ROTH, *Circuit Judges*

(Filed: October 23, 2013)

Andre G. Bouchard
Joel E. Friedlander
Jeffrey M. Gorris
Bouchard, Margules & Friedlander
Wilmington, DE 19801

Lawrence A. Hamermesh
Widener University School of Law
Wilmington, DE 19803
Andrew J. Pincus [Argued]
Mayer Brown
1999 K Street, N.W.
Washington, DC 20006

*Attorneys for Appellants*

David L. Finger [Argued]
Finger & Slanina
Wilmington, DE 19801-0000

*Attorney for Appellee*

S. Mark Hurd
Morris, Nichols, Arsht & Tunnell
Wilmington, DE 19899

*Attorney for Amicus Curiae*
*The Corporation Law Section of the Delaware State Bar*
*Association*

2

Roy T. Englert, Jr.
Robbins, Russell, Englert, Orseck & Untereiner
Washington, DC 20006

*Attorney for Amici Curiae*
*The Chamber of Commerce of the United States of America*
*and Business Roundtable*

Scott L. Nelson
Public Citizen Litigation Group
Washington, DC 20009

*Attorney for Amicus Curiae*
*Public Citizen, Inc.*

Bruce D. Brown
The Reporters Committee for Freedom of the Press
Arlington, VA 22209

*Attorney for Amici Curiae*
*The Reporters Committee for Freedom of the Press and*
*Twelve New Organizations*

_____

OPINION
_____

SLOVITER, *Circuit Judge*.

This appeal requires us to decide whether the public has a right of access under the First Amendment to Delaware's state-sponsored arbitration program. Chancellor Strine and the judges of the Delaware Chancery Court ("Appellants"), who oversee the arbitrations, appeal a judgment on the pleadings entered in favor of the Delaware Coalition for Open Government (the "Coalition"). The District Court found that Delaware's proceedings were essentially civil trials that must be open to the public. Appellants dispute the similarities and argue that the First Amendment does not mandate a right of public access to Delaware's proceedings.

**I.**

In early 2009, in an effort to "preserve Delaware's pre-eminence in offering cost-effective options for resolving disputes, particularly those involving commercial, corporate, and technology matters," Delaware amended its code to grant the Court of Chancery "the power to arbitrate business disputes." H.B. 49, 145th Gen. Assemb. (Del. 2009). As a result, the Court of Chancery created an arbitration process as an alternative to trial for certain kinds of disputes. As currently implemented, the proceeding is governed both by

4

statute and by the Rules of the Delaware Court of Chancery. *See* 10 DEL. CODE ANN. tit. 10, § 349 (2009); Del. Ch. R. 96-98.

Delaware's government-sponsored arbitrations are not open to all Delaware citizens. To qualify for arbitration, at least one party must be a "business entity formed or organized" under Delaware law, tit. 10 § 347(a)(3), and neither party can be a "consumer," *id.* § 347(a)(4). The statute is limited to monetary disputes that involve an amount-in-controversy of at least one million dollars. *Id.* § 347(a)(5).

Once qualified parties have consented "by agreement or by stipulation" to avail themselves of the proceeding, they can petition the Register in Chancery to start arbitration. *Id.* § 347(a)(1); Del. Ch. R. 97(a). The fee for filing is $12,000, and the arbitration costs $6,000 per day after the first day. Standing Order of Del. Ch. (Jan. 4, 2010). After receiving a petition the Chancellor selects a Chancery Court judge to hear the arbitration. *See* Del. Ch. R. 97(b); tit. 10, § 347(a).[1] The arbitration begins approximately ninety days after the petition is filed, and, as the parties agreed in oral argument, is conducted in a Delaware courthouse during normal business hours. *See* Del. Chr. R. 97(e). Regular Court of Chancery Rules 26-37, governing depositions and discovery, apply to the proceeding, but the rules can be modified by consensual agreement of the parties. *See id.* at 96(c); *id.* at 26-37.

---

[1] Although the statute governing Delaware's procedure allows for the Chancellor to appoint non-Chancery Court judges as arbitrators, *see* tit. 10, § 347(a), the Coalition only challenges arbitration by a member of the court.

The Chancery Court judge presiding over the proceeding "[m]ay grant any remedy or relief that [s/he] deems just and equitable and within the scope of any applicable agreement of the parties." *Id.* at 98(f)(1). Once a decision is reached, a final judgment or decree is automatically entered. *Id.* at 98(f)(3). Both parties have a right to appeal the resulting "order of the Court of Chancery" to the Delaware Supreme Court, but that court reviews the arbitration using the deferential standard outlined in the Federal Arbitration Act. Tit. 10, § 349(c). Arbitrations can therefore only be vacated in relatively rare circumstances, such as when a party can prove that the "award was procured by corruption, fraud, or undue means" or that the "arbitrator[] w[as] guilty of misconduct." 9 U.S.C. § 10; *see also Metromedia Energy, Inc. v. Enserch Energy Servs., Inc.*, 409 F.3d 574, 578 (3d Cir. 2005).

Both the statute and rules governing Delaware's proceedings bar public access. Arbitration petitions are "considered confidential" and are not included "as part of the public docketing system." Tit. 10, § 349(b); Del. Ch. R. 97(4). Attendance at the proceeding is limited to "parties and their representatives," and all "materials and communications" produced during the arbitration are protected from disclosure in judicial or administrative proceedings. Del. Ch. R. 98(b).

If one of the parties appeals to the Supreme Court of Delaware for enforcement, stay, or vacatur, the record of the proceedings must be filed "with the Supreme Court in accordance with its Rules." *Id.* at 97(a)(4). "The petition and any supporting documents are considered confidential and not

6

of public record until such time, if any, as the proceedings are the subject of an appeal." *Id.* The Delaware Supreme Court has yet to adopt rules that would govern the confidentiality of appeals from Delaware's arbitration program, and there is no record of a public appeal from an arbitration award.

In the District Court, the Coalition moved for judgment on the pleadings, arguing that the confidentiality of Delaware's government-sponsored arbitration proceedings violated the First Amendment. The District Court granted the Coalition's motion. The judges of the Delaware Chancery Court appeal.

## II.

The District Court had jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343, and we have jurisdiction pursuant to 28 U.S.C. § 1291. We exercise de novo review over the District Court's grant of a motion for judgment on the pleadings. *DiCarlo v. St. Mary Hosp.*, 530 F.3d 255, 259 (3d Cir. 2008).

"The First Amendment, in conjunction with the Fourteenth, prohibits governments from 'abridging the freedom of speech, or of the press . . . .'" *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 575 (1980) (quoting U.S. CONST. amend. I). This protection of speech includes a right of public access to trials, a right first elucidated by the Supreme Court in *Richmond Newspapers*. In that case the Court found that a Virginia trial court had violated the First Amendment by closing a criminal trial to the public. *See id.* at 580. Chief Justice Burger's opinion for the plurality emphasized the important role public access

7

plays in the administration of justice and concluded that "[t]he explicit, guaranteed rights to speak and publish concerning what takes place at a trial would lose much meaning if access to observe the trial could . . . be foreclosed arbitrarily." *Id.* at 576-77.

The Court has since found that the public also has a right of access to voir dire of jurors in criminal trials, *see Press-Enter. Co. v. Superior Court*, 464 U.S. 501, 511 (1984) ("*Press I*"), and to certain preliminary criminal hearings. *See El Vocero de P.R. v. Puerto Rico*, 508 U.S. 147, 149-50 (1993) (per curiam) (preliminary criminal hearings as conducted in Puerto Rico); *Press-Enter. Co. v. Superior Court*, 478 U.S. 1, 10 (1986) ("*Press II*") (preliminary criminal hearings as conducted in California).

We have found a right of public access to civil trials, as has every other federal court of appeals to consider the issue. *See Publicker Indus., Inc. v. Cohen*, 733 F.2d 1059 (3d Cir. 1984); *see also F.T.C. v. Standard Fin. Mgmt. Corp.*, 830 F.2d 404, 410 (1st Cir. 1987); *Westmoreland v. Columbia Broad. Sys., Inc.*, 752 F.2d 16, 23 (2d Cir. 1984); *Rushford v. New Yorker Magazine, Inc.*, 846 F.2d 249, 253 (4th Cir. 1988); *Brown & Williamson Tobacco Corp. v. F.T.C.*, 710 F.2d 1165, 1179 (6th Cir. 1983); *In re Cont'l Ill. Sec. Litig.*, 732 F.2d 1302, 1309 (7th Cir. 1984). In addition to finding a right of public access to civil trials, we have also found a First Amendment right of the public to attend meetings of Pennsylvania city planning commissions and post-trial juror examinations. *See Whiteland Woods, L.P. v. Twp. of W. Whiteland*, 193 F.3d 177, 180-81 (3d Cir. 1999) (planning commissions); *United States v. Simone*, 14 F.3d 833, 840 (3d Cir. 1994) (post-trial juror examinations). We have declined,

8

however, to extend the right to the proceedings of judicial disciplinary boards, the records of state environmental agencies, deportation hearings, or the voting process. *See First Amendment Coal. v. Judicial Inquiry & Review Bd.*, 784 F.2d 467, 477 (3d Cir. 1986) (en banc) (judicial disciplinary board); *Capital Cities Media, Inc. v. Chester*, 797 F.2d 1164, 1175-76 (3d Cir. 1986) (en banc) (records of state environmental agencies); *N. Jersey Media Grp., Inc. v. Ashcroft*, 308 F.3d 198, 209 (3d Cir. 2002) (deportation hearings); *PG Publ'g Co. v. Aichele*, 705 F.3d 91, 112 (3d Cir. 2013) (voting process).

## The Experience and Logic Test

A proceeding qualifies for the First Amendment right of public access when "there has been a tradition of accessibility" to that kind of proceeding, and when "access plays a significant positive role in the functioning of the particular process in question." *Press II*, 478 U.S. at 10, 8. The examination of the history and functioning of a proceeding has come to be known as the "experience and logic" test. *See, e.g., Simone*, 14 F.3d at 838. In order to qualify for public access, both experience and logic must counsel in favor of opening the proceeding to the public. *See N. Jersey Media Grp.*, 308 F.3d at 213-14. Once a presumption of public access is established it may only be overridden by a compelling government interest. *Press II*, 478 U.S. at 9.

The District Court did not apply the experience and logic test. Instead, it concluded that because Delaware's government-sponsored arbitration was "sufficiently like a trial," and because a right of public access applies to civil

9

trials, a right of public access must also apply to Delaware arbitrations.  *See Del. Coal. for Open Gov't v. Strine*, 894 F. Supp. 2d 493, 500 (2012) (quoting *El Vocero*, 508 U.S. at 149).  We find the District Court's reliance on *El Vocero* misplaced and its decision to bypass the experience and logic test inappropriate.  In *El Vocero* the Supreme Court held in a per curiam opinion that the First Amendment right of public access applies to preliminary criminal hearings in Puerto Rico.  The Supreme Court did not engage in an experience and logic analysis in that case, but that was because it had already conducted such an inquiry in *Press I*, a case concerning nearly identical preliminary hearings in California.  *See El Vocero*, 508 U.S. at 149 (citing *Press I*, 478 U.S. at 12).

Although Delaware's arbitration proceeding shares a number of features with a civil trial, the two are not so identical as to fit within the narrow exception articulated by the Supreme Court in *El Vocero*.  We therefore must examine Delaware's proceeding under the experience and logic test.

A.  Experience

Under the experience prong of the experience and logic test, we "consider whether 'the place and process have historically been open to the press and general public,' because such a 'tradition of accessibility implies the favorable judgment of experience.'"  *N. Jersey Media Grp.,* 308 F.3d at 211 (quoting *Press II*, 478 U.S. at 8).  In order to satisfy the experience test, the tradition of openness must be strong; however, "a showing of openness at common law is not required."  *PG Publ'g Co.*, 705 F.3d at 108 (quoting *N. Jersey*

10

*Media Grp.*, 308 F.3d at 213) (internal quotation marks omitted).

The litigants in this case disagree over which history is relevant to Delaware's proceedings. The Appellants suggest that we only examine the history of arbitrations, whereas the Coalition suggests we only examine the history of civil trials. Neither suggestion is appropriate in isolation. If we were to only analyze the history of arbitrations as the Appellants suggest, we would be accepting the state's designation of its proceedings as arbitrations at face value. Uncritical acceptance of state definitions of proceedings would allow governments to prevent the public from accessing a proceeding simply by renaming it. A First Amendment right that mandated access to civil trials, but allowed closure of identical "sivel trials" would be meaningless. Thus, the Supreme Court has held that "the First Amendment question cannot be resolved solely on the label we give the event, i.e., 'trial' or otherwise." *Press II*, 478 U.S. at 7. The Coalition's suggestion—that we rely solely on the history of civil trials—is also flawed. Defining Delaware's proceeding as a civil trial at the outset would beg the question at issue here, and elide the differences between Delaware's arbitration proceeding and other civil proceedings.

There is no need to engage in so narrow a historical inquiry as the parties suggest. In determining the bounds of our historical inquiry, we look "not to the practice of the specific public institution involved, but rather to whether the particular *type* of government proceeding [has] historically been open in our free society." *PG Publ'g Co.*, 705 F.3d at 108 (quoting *Capital Cities*, 797 F.2d at 1175) (internal quotation marks omitted) (emphasis in *PG Publ'g Co.*). In

11

prior public access cases we have defined the type of proceeding broadly, and have often found "wide-ranging" historical inquiries helpful to our analysis of the First Amendment right of public access. *Id.* Thus in *North Jersey Media Group*, a case involving deportation hearings, we considered the entire history of access to "political branch proceedings." *N. Jersey Media Grp.*, 308 F.3d at 209. We exercised a similarly broad approach in *PG Publishing Company*, a case involving a challenge to a state statute restricting access to polling places in which we analyzed "not just the act of voting, but also the act of entering the polling place and signing in to vote." *See PG Publ'g Co.*, 705 F.3d at 109.

Following this broad historical approach, we find that an exploration of both civil trials and arbitrations is appropriate here. Exploring both histories avoids begging the question and allows us to fully consider the "judgment of experience." *Press II*, 478 U.S. at 11 (internal quotation marks omitted).

### 1. Civil Trials and the Courthouse

As we explained in *Publicker*, there is a long history of access to civil trials. *See Publicker*, 733 F.2d at 1068-70. The English history of access dates back to the Statute of Marlborough passed in 1267, which required that "all Causes . . . to be heard, ordered, and determined before the Judges of the King's Courts [were to be heard] *openly* in the King's Courts." *Id.* at 1068 (citing 2 EDWARD COKE, INSTITUTES OF THE LAWS OF ENGLAND 103 (6th ed. 1681)) (emphasis in *Publicker*). This tradition of openness continued in English Courts for centuries, ensuring that evidence was delivered "'in the open Court and in the Presence of the Parties, their

12

Attorneys, Council, and all By-standers, and before the Judge and Jury . . . .'" *Id.* (quoting MATTHEW HALE, HISTORY OF THE COMMON LAW OF ENGLAND 163 (Charles M. Gray ed., U. Chicago Press 1971) (1713)).  Thus, "'one of the most conspicuous features of English justice, that *all* judicial trials are held in open court, to which the public have free access, . . . appears to have been the rule in England from time immemorial.'" *Id.* at 1069 (quoting EDWARD JENKS, THE BOOK OF ENGLISH LAW 73-74 (6th ed. 1967)).

This tradition of access to trials and the courthouse was adopted by the American colonies and preserved after the American Revolution.  *See id.*  Courthouses served a central place in colonial life, encouraging "the active participation of community members" in shaping the "local practice of justice."  Norman W. Spaulding, *The Enclosure of Justice: Courthouse Architecture, Due Process, and the Dead Metaphor of Trial*, 24 YALE J.L. & HUMAN. 311, 318-19 (2012).  As courthouses grew increasingly elaborate in the late-eighteenth century, they continued to encourage public viewing, albeit in more formal surroundings.  *See id.* at 329-32.  The courtroom also maintained its important public role: "[w]ith juries, spectators from the community, and press all present," the courtroom "became a public state—a familiar, indeed immediately recognizable enclosure, in which the process of rights definition was made public . . . ."  *Id.* at 332.

Today, civil trials and the court filings associated with them are generally open to the public.  *Id; see, e.g.*, Del. Ch. R. 5.1(g)(1).  The courthouse, courtroom, and trial remain essential to the way the public conceives of and interacts with the judicial system.  *See* David Ray Papke, *The Impact of Popular Culture on American Perceptions of the Courts*, 82

13

Ind. L.J. 1225, 1233-34 (2007); *see also* Spaulding, 24 YALE J.L. & HUMAN. at 342.

### 2. *Arbitrations*

Arbitrations also have a long history. Written records of proceedings resembling arbitrations have been found in England as early as the twelfth century. *See* 1 MARTIN DOMKE ET AL., DOMKE ON COMMERCIAL ARBITRATION § 2:5 (3d ed. 2011); 1 IAN R. MACNEIL ET AL., FEDERAL ARBITRATION LAW: AGREEMENTS, AWARDS, AND REMEDIES UNDER THE FEDERAL ARBITRATION ACT § 4.2.1 (1999). Early arbitrations involved community participation, and evidence suggests that they took place in public venues. *See* Edward Powell, *Settlement of Disputes by Arbitration in Fifteenth-Century England*, 2 LAW & HIST. REV. 21, 29, 33-34 (1984); *see generally* LETTERS AND PAPERS OF JOHN SHILLINGFORD, MAYOR OF EXETER 1447-50 at 8 (Stuart A. Moore ed., 1871) (detailing arbitration proceeding overseen by chancellor and judges). The use of arbitrations to resolve private disputes, however, was limited by English precedent, which prevented the enforcement of binding agreements to arbitrate. *See* MACNEIL § 4.2.2.

In the American colonies, arbitrations provided a way for colonists who harbored "suspicion of law and lawyers" to resolve disputes in their communities in a "less public and less adversarial" way. JEROLD S. AUERBACH, JUSTICE WITHOUT LAW?: RESOLVING DISPUTES WITHOUT LAWYERS 4 (1983); Bruce H. Mann, *The Formalization of Informal Law: Arbitration Before the American Revolution*, 59 N.Y.U. L. Rev. 443, 454 (1984). By the eighteenth century, however, arbitrations adopted increasingly formal procedures,

14

and at least some appear to have taken place in public. *See* Mann, *The Formalization of Informal Law* at 468.

As the American economy grew, disputes over business transactions led to the further development of arbitration proceedings. These proceedings were occasionally supervised by a member of the judiciary "not acting in his official capacity." *Id.* at 475. The popularity of commercial arbitration, however, was limited by precedent that made agreements to arbitrate essentially unenforceable. *See* MACNEIL § 4.3.2; *see also* Amalia D. Kessler, *Deciding Against Conciliation: The Nineteenth-Century Rejection of a European Transplant and the Rise of a Distinctively American Ideal of Adversarial Adjudication*, 10 THEORETICAL INQUIRES L. 423, 445-46 (2009). It was not until the passage of New York's Arbitration Act of 1920 and the Federal Arbitration Act of 1925, that arbitration agreements began to be treated by the courts like ordinary contracts. DOMKE § 2:8; *see also* MACNEIL § 4.1.2. These arbitration acts allowed private arbitration to take on the important role it now serves in resolving commercial disputes. *See* MACNEIL §§ 5.3, 5.4.

Modern arbitration law has led to the development of an industry devoted to offering arbitration services. Groups such as the American Arbitration Association and JAMS, Inc. facilitate arbitration by appointing arbitrators, organizing hearings, and setting arbitration standards. *See* Stephen Hayford & Ralph Peeples, *Commercial Arbitration in Evolution: An Assessment and Call for Dialogue*, 10 OHIO ST. J. ON DISP. RESOL. 343, 362-68 (1995). These arbitrations, unlike some of their antecedents, are distinctly private. Parties engaged in arbitration must pay both for the

15

arbitrations and for the space in which the arbitrations occur, and they usually choose to close their arbitrations to the public. *See* Michael Collins, *Privacy and Confidentiality in Arbitration Proceedings*, 30 TEX. INT'L L.J. 121, 122 (1995). *But see* 3 MACNEIL ET AL., FEDERAL ARBITRATION LAW § 32.6.1 (1999) (noting that parties can elect to allow access to proceedings).

Although modern arbitration is dominated by private actors, a number of jurisdictions offer alternative dispute resolution procedures as a supplement to civil litigation. *See generally* Yishai Boyarin, *Court-Connected ADR—A Time of Crisis, A Time of Change*, 50 FAM. CT. REV. 377 (2012). These procedures are sometimes called arbitrations, but unlike private arbitrations, they are usually non-binding, and can sometimes be initiated without the parties' consent. *See* Amy J. Schmitz, *Nonconsensual + Nonbinding = Nonsensical? Reconsidering Court-Connected Arbitration Programs*, 10 CARDOZO J. CONFLICT RESOL. 587, 588-89, 618 (2009).

The history of arbitration thus reveals a mixed record of openness. Although proceedings labeled arbitrations have sometimes been accessible to the public, they have often been closed, especially in the twentieth century. This closure, however, can be explained by the private nature of most arbitrations. Confidentiality is a natural outgrowth of the status of arbitrations as private alternatives to government-sponsored proceedings. Indeed, we would be surprised to find that private arbitrations—taking place before private arbitrators in private venues—had historically been accessible to the public.

16

Taking the private nature of many arbitrations into account, the history of civil trials and arbitrations demonstrates a strong tradition of openness for proceedings like Delaware's government-sponsored arbitrations. Proceedings in front of judges in courthouses have been presumptively open to the public for centuries. History teaches us not that all arbitrations must be closed, but that arbitrations with non-state action in private venues tend to be closed to the public.[2] Although Delaware's government-sponsored arbitrations share characteristics such as informality, flexibility, and limited review with private arbitrations, they differ fundamentally from other arbitrations because they are conducted before active judges in a courthouse, because they result in a binding order of the Chancery Court, and because they allow only a limited right of appeal.

When we properly account for the type of proceeding that Delaware has instituted—a binding arbitration before a judge that takes place in a courtroom—the history of openness is comparable to the history that this court described in *Publicker* and the Supreme Court found in *Richmond*

---

[2] Understood in this way, the closure of private arbitrations is only of questionable relevance. Meetings by private organizations, for example, are usually closed to the public, yet we did not consider this history of closure when we found a First Amendment right of public access to city planning commissions. *See Whiteland Woods, L.P. v. Twp. of W. Whiteland*, 193 F.3d 177 (3d Cir. 1999). Nor did we consider the history of access to votes undertaken by private organizations, when we examined the history of the voting process. *See PG Publ'g Co.*, 705 F.3d at 110.

17

*Newspapers*. Thus, unlike the "recent-and rebuttable-regulatory (sic) presumption" of openness in deportation hearings we examined in *North Jersey Media Group*, 308 F.3d at 213, or the "long-standing trend away from openness" in the electoral process we found in *PG Publishing Co.*, 705 F.3d at 110, the right of access to government-sponsored arbitrations is deeply rooted in the way the judiciary functions in a democratic society. Our experience inquiry therefore counsels in favor of granting public access to Delaware's proceeding because both the "place and process" of Delaware's proceeding "have historically been open to the press and general public." *Press II*, 478 U.S. at 8.

B. Logic

Under the logic prong of the experience and logic test we examine whether "access plays a significant positive role in the functioning of the particular process in question." *Id.* We consider both the positive role that access plays, and also "the extent to which openness impairs the public good." *N. Jersey Media Grp.*, 308 F.3d at 202.

> We have recognized that public access to judicial proceedings provides many benefits, including [1] promotion of informed discussion of governmental affairs by providing the public with the more complete understanding of the [proceeding]; [2] promotion of the public perception of fairness which can be achieved only by permitting full public view of the proceedings; [3] providing a significant community therapeutic value as an outlet for community concern, hostility and emotion; [4]

> serving as a check on corrupt practices by
> exposing the [proceeding] to public scrutiny; [5]
> enhancement of the performance of all
> involved; and [6] discouragement of [fraud].

*PG Publ'g Co.*, 705 F.3d at 110-11 (quoting *Simone*, 14 F.3d at 839). All of these benefits would accrue with the opening of Delaware's proceeding. Allowing public access to state-sponsored arbitrations would give stockholders and the public a better understanding of how Delaware resolves major business disputes. Opening the proceedings would also allay the public's concerns about a process only accessible to litigants in business disputes who are able to afford the expense of arbitration. In addition, public access would expose litigants, lawyers, and the Chancery Court judge alike to scrutiny from peers and the press. Finally, public access would discourage perjury and ensure that companies could not misrepresent their activities to competitors and the public.

The benefits of openness weigh strongly in favor of granting access to Delaware's arbitration proceedings. In comparison, the drawbacks of openness that Appellants cite are relatively slight. First, Appellants contend that confidentiality is necessary to protect "patented information, trade secrets, and other closely held information." Appellants' Br. at 60. This information, however, is already protected under Delaware Chancery Court Rule 5.1, which provides for the confidential filing of documents, including "trade secrets; sensitive proprietary information; [and] sensitive financial, business, or personnel information" when "the public interest in access to Court proceedings is outweighed by the harm that public disclosure of sensitive, non-public information would cause." Del. Ch. R. 5.1(b)(2).

19

These tailored protections are compatible with the First Amendment right of public access. *See Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 33-36 (1984).

Second, Delaware argues that confidentiality is necessary to prevent the "'loss of prestige and goodwill'" that disputants would suffer in open proceedings. Appellants' Br. at 60 (quoting J. Noble Braden, *Sound Rules and Administration in Arbitration*, 83 U. PA. L. REV. 189, 195 (1934)). Although the loss of prestige and goodwill may be unpleasant for the parties involved, it would not hinder the functioning of the proceeding, nor impair the public good. As we have previously held, the exposure of parties to public scrutiny is one of the central benefits of public access. *See, e.g., PG Publ'g Co.*, 705 F.3d at 110-11.

The Appellants' third argument is that privacy encourages a "less hostile, more conciliatory approach." *See* Appellants' Br. at 61 (citing ALAN SCOTT RAU ET AL., PROCESSES OF DISPUTE RESOLUTION: THE ROLE OF LAWYERS 601 (3d ed. 2002)). This may sometimes be true, but even private binding arbitrations can be contentious. *See* Raymond G. Bender, Jr., *Arbitration—An Ideal Way to Resolve High-Tech Industry Disputes*, 65 DISP. RESOL. J. 44, 49 (2010) ("[A]dvocates seeking to achieve the best outcomes for their clients have interjected litigation-like techniques into arbitration—contentious advocacy, uncontrolled discovery, aggressive motion practice, and other adversarial techniques aimed at achieving a 'leg-up' in the contest."). Moreover, informality, not privacy, appears to be the primary cause of the relative collegiality of arbitrations. *See* ALAN SCOTT RAU ET AL, PROCESSES OF DISPUTE RESOLUTION, 601 (1989) (citing "relative informality" of arbitration as reason for

20

reduced contentiousness); Christopher Baum, *The Benefits of Alternative Dispute Resolution in Common Interest Development Disputes*, 84 SAINT JOHN'S L. REV. 907, 925 (2010) ("Arbitration is also less contentious than litigation because the formal rules of evidence do not apply, unless the parties agree otherwise."). We therefore do not find that a possible reduction in conciliation caused by public access should weigh heavily in our analysis.

Finally, Appellants argue that opening the proceeding would effectively end Delaware's arbitration program. This argument assumes that confidentiality is the sole advantage of Delaware's proceeding over regular Chancery Court proceedings. But if that were true—if Delaware's arbitration were just a secret civil trial—it would clearly contravene the First Amendment right of access. On the contrary: as the Appellants point out in the rest of their brief, there are other differences between Delaware's government-sponsored arbitration and regular Chancery Court proceedings. Arbitrations are entered into with the parties' consent, the parties have procedural flexibility, and the arbitrator's award is subject to more limited review. Thus, disputants might still opt for arbitration if they would like access to Chancery Court judges in a proceeding that can be faster and more flexible than regular Chancery Court trials.[3]

---

[3] Even if granting public access to Delaware's arbitrations were to limit their appeal, parties would still have two effective alternatives: private arbitration or public proceedings before the Chancery Court. Thus, Appellants' contention that allowing public access to Delaware's state-sponsored arbitration proceedings would lead to a mass exodus of corporations is overstated.

21

I agree with Judge Roth on the virtues of arbitration. I cannot help but question why the Delaware scheme limits those virtues to litigants whose disputes involve an amount in controversy of at least a million dollars, and neither of whom is a consumer. One wonders why the numerous advantages set forth in Judge Roth's dissenting opinion (which apparently motivated the Delaware legislature) should not also be available to businesspersons with less than a million dollars in dispute. I see no explanation in Judge Roth's dissent for the limitation to rich businesspersons.

In her dissent, Judge Roth states that she believes that I do not appreciate the difference between adjudication and arbitration, *i.e.*, "that a judge in a judicial proceeding derives her authority from the coercive power of the state, while a judge serving as an arbitrator derives her authority from the consent of the parties." Indeed I do.

Delaware's proceedings are conducted by Chancery Court judges, in Chancery Court during ordinary court hours, and yield judgments that are enforceable in the same way as judgments resulting from ordinary Chancery Court proceedings. Delaware's proceedings derive a great deal of legitimacy and authority from the state. They would be far less attractive without their association with the state. Therefore, the interests of the state and the public in openness must be given weight, not just the interests of rich businesspersons in confidentiality.

Like history, logic weighs in favor of granting access to Delaware's government-sponsored arbitration proceedings. The benefits of access are significant. It would ensure

22

accountability and allow the public to maintain faith in the Delaware judicial system. A possible decrease in the appeal of the proceeding and a reduction in its conciliatory potential are comparatively less weighty, and they fall far short of the "profound" security concerns we found compelling in *North Jersey Media Group*. *See* 308 F.3d at 220.

## III.

Because there has been a tradition of accessibility to proceedings like Delaware's government-sponsored arbitration, and because access plays an important role in such proceedings, we find that there is a First Amendment right of access to Delaware's government-sponsored arbitrations. We will therefore affirm the order of the District Court.

*Delaware Coalition for Open Government v. Strine*, No. 12-3859
FUENTES, J., concurring:

Today we affirm the District Court's ruling, which concluded that "the right of access applies to the Delaware proceeding created by section 349 of the Delaware Code." *Del. Coal. for Open Gov't v. Strine*, 894 F. Supp. 2d 493, 504 (D. Del. 2012). Specifically, the District Court held that "the portions of [section 349] and [of] Chancery Court Rules 96, 97, and 98, which make the proceeding confidential, violate that right." *Id.* I agree. I write separately because, given that not all provisions of § 349 of the Delaware Code or the Chancery Court Rules relating to Judge-run arbitration proceedings are unconstitutional, I think it is necessary to be more specific than the District Court's order in pointing out those that are problematic and those that are not.

I begin with § 349(b), which provides for the confidentiality in arbitration proceedings for business disputes. This section states that:

> Arbitration proceedings shall be considered confidential and not of public record until such time, if any, as the proceedings are the subject of an appeal. In the case of an appeal, the record shall be filed by the parties with the Supreme Court in accordance with its rules, and to the extent applicable, the rules of the Court of Chancery.

Del. Code. Ann., tit. 10, § 349(b).

1

I agree with Judge Sloviter that this provision violates the First Amendment right of public access and cannot stand. However, I see nothing wrong with the other provisions of this statute. I do not believe that § 349(a), granting the Chancery Court the power to arbitrate business disputes, or § 349(c), providing for the filing of "applications to vacate, stay, or enforce an [arbitral] order" with the Delaware Supreme Court, violate the public right of access when § 349(b) is removed from the statutory scheme.

Similarly, not all provision of the Court of Chancery Court Rules implementing § 349 arbitrations raise constitutional concerns. Chancery Court Rule 97(a)(4) provides:

> "The Register in Chancery will not include the petition [for arbitration] as part of the public docketing system. The petition and any supporting documents are considered confidential and not part of public record until such time, if any, as the proceedings are the subject of an appeal. In the case of an appeal, the record shall be filed by the parties with the Supreme Court in accordance with its Rules, and to the extent applicable, the Rules of this Court."

Chancery Court Rule 98(b) likewise provides that:

> "Arbitration hearings are private proceedings such that only parties and their representatives may attend, unless all parties agree otherwise. An Arbitrator may not be compelled to testify in

2

any judicial or administrative proceeding concerning any matter relating to service as an Arbitrator. All memoranda and work product contained in the case files of an Arbitrator are confidential. Any communication made in or in connection with the arbitration that relates to the controversy being arbitrated, whether made to the Arbitrator or a party, or to any person if made at an arbitration hearing, is confidential. Such confidential materials and communications are not subject to disclosure in any judicial or administrative proceeding with the following exceptions: (1) where all parties to the arbitration agree in writing to waive the confidentiality, or (2) where the confidential materials and communications consist of statements, memoranda, materials, and other tangible evidence otherwise subject to discovery, which were not prepared specifically for use in the arbitration hearing.

Again, I agree with Judge Sloviter that these provisions violate the First Amendment, but I do not find any problem with the remainder of the Chancery Court Rules implementing the § 349 arbitrations. Chancery Court Rule 96, containing certain definitions, is in my view constitutional in its entirety. Similarly, the remaining portions of Rules 97 and 98, which provide for the scope of arbitration, the proper procedures for an arbitration, and the logistics of hearings and dispute resolution, pass constitutional muster when Rules 97(a)(4) and 98(b) are excised from the law.

3

"The unconstitutionality of a part of an Act does not necessarily defeat or affect the validity of its remaining provisions." *Champlin Ref. Co. v. Corp. Comm'n of Okla.*, 286 U.S. 210, 234 (1932). It is well-settled that we must "refrain from invalidating more of a statute than is necessary." *Regan v. Time, Inc.*, 468 U.S. 641, 652 (1984). Even when construing state laws "[w]e prefer . . . to enjoin only the unconstitutional applications of [a] statute while leaving other applications in force, or to sever its problematic portions." *Ayotte v. Planned Parenthood of Northern New England*, 546 U.S. 320, 328-29 (2006) (internal citation omitted).

The crux of today's holding is that the proceedings set up by § 349 violate the First Amendment because they are conducted outside the public view, not because of any problem otherwise inherent in a Judge-run arbitration scheme. Thus, Appellants are enjoined only from conducting arbitrations pursuant to § 349(b) of Title 10 of the Delaware Code or Rules 97(a)(4) and 98(b) of the Delaware Chancery Court. Nothing in today's decision should be construed to prevent sitting Judges of the Court of Chancery from engaging in arbitrations without those confidentiality provisions.

Appellants suggest that Judge-run arbitrations will not occur under § 349 unless they are conducted in private. This may be so, but neither Appellants nor the Delaware Legislature have presented us with an alternative confidential arbitration scheme sufficiently devoid of the air of official State-run proceeding that infects the system now before us, sufficient to pass constitutional muster. Nor have they otherwise suggested that we attempt to sever offending

4

portions of the statute to construct such an alternative. Thus, we have no occasion to consider if different arbitration schemes pass constitutional muster, and we are left with no choice other than to sever the confidentiality provisions. *See generally Alaska Airlines v. Brock*, 480 U.S. 678, 685 (1987) (explaining that a court may not sever a portion of a law unless it can conclude that "the statute created in its absence is legislation that [the Legislature] would . . . have enacted").

Appellants only severability argument is a very limited one, that invalidating the self-executing aspect of the arbitral awards, Del. Ch. R. 98(f)(3), is enough to cure any constitutional infirmity. But as Appellants themselves describe it, the procedure contemplated in Rule 98(f)(3) is merely "a matter of convenience." Appellants' Reply Br. at 28. It eliminates the need to file the arbitral award in court, a step that is only significant if a party refuses to abide by an arbitrator's award, a rarely occurring contingency. For essentially the reasons stated in Judge Sloviter's opinion, the mere formality of filing that award in Court, which Rule 98(f)(3) skirts, does not alone alter the First Amendment right of access calculus one way or another.

But I reiterate that we do not express any view regarding the constitutionality of a law that may allow sitting Judges to conduct private arbitrations if the system set up by such a law varies in certain respects from the scheme before us today. Indeed, it is likely that the Delaware Legislature has at its disposal several alternatives should it wish to continue to pursue a scheme of Judge-run arbitrations.

5

With this understanding of the scope of today's decision, I join in Judge Sloviter's opinion and concur in the judgment.

ROTH, <u>Circuit Judge</u>, dissenting:

The use of arbitration as a method of resolving business and commercial disputes has been increasing both here and abroad. For example, the caseload of the American Arbitration Association's International Center for Dispute Resolution grew by almost 330 per cent between 1994 and 2004.[1] The number of requests for arbitration in the London Court of International Arbitration grew by 300 per cent in the last decade.[2]

There are a number of factors that have caused this growth in arbitration. One is the importance of resolving disputes expeditiously. Businesses in this country and abroad need to get commercial conflicts resolved as quickly as possible so that commercial relations are not disrupted. Another factor in the growth of arbitration is the increase in commercial disputes between businesses located in different countries. In particular, non-U.S. companies, with no familiarity – or with too much familiarity – with the American judicial system, may prefer arbitration with the rules set by the parties to lengthy and expensive court proceedings. In addition, arbitration permits the proceedings

---

[1] Loukas Mistelis, *International Arbitration – Corporate Attitudes and Practices – 12 Perceptions Tested: Myths, Data and Analysis Research Report*, 15 Am. Rev. Int'l Arb. 525, 527 (2004).

[2] Compare London Court of International Arbitration's *Director General's Report* for 2001 with the *Director General's Reports* for 2010 and 2011, *available at* http://www.lcia.org/LCIA/Casework_Report.aspx

to be kept confidential, protecting trade secrets and sensitive financial information. The Supreme Court has summarized these advantages as follows:

> The point of affording parties discretion in designing arbitration processes is to allow for efficient, streamlined procedures tailored to the type of dispute. It can be specified, for example, that the decisionmaker be a specialist in the relevant field, or that proceedings be kept confidential to protect trade secrets. And the informality of arbitral proceedings is itself desirable, reducing the cost and increasing the speed of dispute resolution..

*AT&T Mobility LLC v. Concepcion*, 131 S.Ct. 1740, 1749 (2011).

The State of Delaware has become interested in sponsoring arbitration as a part of its efforts to preserve its position as the leading state for incorporations in the U.S. One of the reasons that Delaware has maintained this position is the Delaware Court of Chancery, where the judges are experienced in corporate and business law and readily available to resolve this type of dispute. Nevertheless, judicial proceedings in the Court of Chancery are more formal, time consuming and expensive than arbitration proceedings. For that reason, the Court of Chancery, as a formal adjudicator of disputes, may not be able to compete

2

with the new arbitration systems being set up in other states and countries.[3]

In order to prevent the diversion elsewhere of complex business and corporate cases, the Delaware Legislature in 2009 enacted legislation to create an arbitration system. The Legislature established the arbitral system in the Court of Chancery where the judges are the most experienced in corporate and business litigation. The Legislature declared that the new system was "intended to preserve Delaware's preeminence in offering cost-effective options for resolving disputes, particularly those involving commercial, corporate,

---

[3] *See* N.Y. State Bar Ass'n, Task Force on N.Y. Law in Int'l Matters, *Final Report* 4 (June 25, 2011) ('[J]urisdictions around the world, many with government support, are taking steps to increase their arbitration case load. New arbitration laws were enacted in 2010 and 2011 in France, Ireland, Hong Kong, Scotland, Ghana and other nations to enhance their attractiveness as seats of arbitration. . . . In 2010, at least three jurisdictions established specialized courts to handle international arbitration matters – Australia, India and Ireland. Several other jurisdictions well-known for international arbitration, including France, the United Kingdom, Switzerland, Sweden and China, have designated certain courts or judges to hear cases to challenge or enforce arbitration awards. Among the cited reasons for this focus on arbitration is the governments' recognition of the importance of arbitration to their economies and to their position in toady's world of global commerce."); *id.* at 38, *available at* http://www.nysba.org/workarea/DownloadAsset.aspx?id=340 27.

and technology matters." H.B. 49, 145th Gen. Assem. (Del. 2009).

This Delaware arbitration system is offered to business entities (at least one of which must have been formed or organized under Delaware law; no party can be a consumer) to resolve expensive and complex disputes (for disputes involving solely monetary damages, the amount in controversy must be at least $1,000,000) with the consent of the parties. The arbitrators are judges of the Court of Chancery or others authorized under the Rules of the Court of Chancery. The proceedings are confidential. In my view, such a set-up creates a perfect model for commercial arbitration.

Judge Sloviter urges, however, that the Delaware system violates the First Amendment of the U.S. Constitution. Maj. at 23. In arriving at this conclusion, she does not rely solely on either the history of arbitration or the history of civil trials. She looks "'not to the practice of the specific public institution involved, but rather to whether the particular *type* of government proceeding [has] historically been open in our free society'." Maj. at 11 (quoting *PG Publ'g Co. v. Aichele*, 705 F.3d 91, 108 (3d Cir. 2013) (quoting *Capital Cities Media, Inc. v. Chester*, 797 F.2d 1164, 1175 (3d Cir. 1986) (en banc)) (alterations in original).[4] She classifies that

---

[4] I believe that Judge Sloviter does not appreciate the difference between adjudication and arbitration, *i.e.*, that a judge in a judicial proceeding derives her authority from the coercive power of the state while a judge serving as an arbitrator derives her authority from the consent of the parties.

4

"particular type of government proceeding," which would occur in the Delaware arbitration system, as one that has traditionally been open to the public. Maj. at 11. In my view, her analysis begs the question.

On the other hand, Judge Fuentes, while concurring with Judge Sloviter, is less broad in his conclusion. His concern is with the confidentiality of the proceedings. He concludes that the confidentiality provisions of 10 Del. C. § 349(b) violate the First Amendment right of public access and cannot stand. He also concludes that the confidentiality provisions for docketing and holding hearings found in Chancery Court Rules 97(a)(4) and 98(b) violate the First Amendment. However, Judge Fuentes finds most of the statute and rules to be acceptable. He has no problem with a sitting judge arbitrating business disputes. He has no problem with the self-executing aspect of the arbitral awards.

I do not agree with Judge Fuentes's contention that the Delaware Court of Chancery's arbitration proceedings cannot be confidential. Confidentiality is one of the primary reasons why litigants choose arbitration to resolve disputes – particularly commercial disputes, involving corporate earnings and business secrets. *See* 1 Bette J. Roth et al., *The Alternative Dispute Resolution Practice Guide* 7:12 (2013).

In this dissent, I will focus on the issue of confidentiality because that is the only area in which Judge Fuentes and I differ. I will not discuss the other issues raised by Judge Sloviter although I could, if necessary, respond to those also. I will limit my discussion to the difference between Judge Fuentes's views and my own.

5

An examination of confidentiality in arbitration should begin in colonial times. The tradition of arbitration in England and the American colonies reveals a focus on privacy. *See* Michael Collins, *Privacy and Confidentiality in Arbitration Proceedings*, 30 Tex. Int'l L.J. 121, 122 (1995) ("In English law . . . it has for centuries been recognized that arbitrations take place in private."); Amy J. Schmitz, *Untangling the Privacy Paradox in Arbitration*, 545 U. Kan. L. Rev. 1211, 1223 (2006) ("The New York Chamber of Commerce . . . established an arbitral regime at the Chamber's inception in 1765. . . . [and] relied on arbitration's privacy and independence to foster efficient resolution of disputes among the American and British merchants during and after the American Revolutionary War.").[5] In the twentieth century, the modern arbitration bodies began to develop rules for arbitration proceedings that emphasize privacy and confidentiality. *See* Richard C. Reuben, *Confidentiality in Arbitration: Beyond the Myth*, 54 U. Kan. L. Rev. 1255, 1271-72 (2006).

Today, the major national and international arbitral bodies continue to emphasize confidentiality. Their rules provide that arbitration proceedings are not open to the public unless the parties agree they will be. *See, e.g.,* AAA & ABA, *Code of Ethics for Arbitrators in Commercial Disputes*, Canon VI(B) (2004); AAA Commercial Arbitration Rules R-23 (2009); UNCITRAL, Arbitration Rules art. 21(3) (2010).

---

[5] The majority asserts that some early arbitrations took place in public. While this may be true, arbitrations even during this period were overwhelmingly private. *See, e.g.,* Michael Collins, *Privacy and Confidentiality in Arbitration Proceedings*, 30 Tex. Int'l L.J. 121, 122 (1995).

6

Thus, as a rule, arbitration has not "historically been open to the press and the general public." *Press II*, 478 U.S. at 8.[6]

With this history of arbitration in mind, looking at experience and logic, *see Press-Enterprise Co. v. Superior Court of Calif. for the Cnty. of Riverside*, 478 U.S. 1, 8 (1986), I conclude that, historically, arbitration has been private and confidential. Logically, the resolution of complex business disputes, involving sensitive financial information, trade secrets, and technological developments, needs to be confidential so that the parties do not suffer the ill effects of this information being set out for the public – and especially competitors -- to misappropriate. For these reasons, there is here no First Amendment right of public access.

In conclusion, then, it appears to me to be very clear that, when the State of Delaware decided to create its arbitration system, it was looking at traditional arbitration, in a confidential setting, before arbitrators experienced in business and corporate litigation. Delaware did not intend the arbitration system to supplant civil trials. Delaware did not intend to preclude the public from attending proceedings that historically have been open to the public. The new system was created to provide arbitration in Delaware to businesses that consented to arbitration – and that would go elsewhere if

---

[6] Judge Sloviter states that the "closure of private arbitrations is only of questionable relevance." Maj. at 16 n.2. I disagree. The development of private arbitration is key to understanding the functions of arbitration as a dispute resolution process and its tradition concerning public access and confidentiality.

7

Delaware did not offer arbitration before experienced arbitrators in a confidential setting.

For the above reasons, I respectfully dissent. I would reverse the judgment of the District Court and uphold the statute and rules which establish the Delaware arbitration system.